## SEATTLE–FIRST NAT. BANK v. UNITED STATES.

### No. 218.

District Court, E. D. Washington, Northern Division.

April 20, 1942.

---

Graves, Kizer & Graves, of Spokane, Wash., for plaintiff.

Lyle Keith, U. S. Atty., and Harvey Erickson, Asst. U. S. Atty., both of Spokane, Wash., for defendant.

SCHWELLENBACH, District Judge.

The plaintiff national banking association grew out of a consolidation in 1935 between the Spokane and Eastern Trust Company, a state bank and trust company of Spokane, and the First National Bank of Seattle, a national banking association. In this consolidation, the two institutions availed themselves of the provisions of Section 331, Chap. 614 of the Act of August 23, 1935, 12 U.S.C.A. § 34a. Pursuant to that act, the necessary preliminary steps looking towards consolidation were taken by the directors and stockholders of the two banks. The consolidation was finally effectuated December 28, 1935, by the issuance of a certificate of consolidation by the Acting Comptroller of the Currency. Prior to the consolidation, the Spokane and Eastern Trust Company owned and held in its security account certain bonds and other securities. It had legal title to certain bonds and stocks which it held in trust. It owned the real estate which included its banking premises. As a consequence of the consolidation, without the issuance of any deed or other instrument of conveyance as to the real estate and without the execution of any instrument of transfer as to the stocks and bonds and other securities, the title to all of such property became vested in the plaintiff. Defendant assessed transfer taxes against the plaintiff and required the purchase and cancellation of revenue stamps therefor. Plaintiff protested such assessment and brings this action for the money paid thereon.

The pertinent portions of the statute under which the consolidation occurred are:

"Any bank incorporated under the laws of any State * * * may be consolidated with a national banking association located in the same State * * * on such terms and conditions as may be lawfully agreed upon by a majority of the board of directors of each association or bank proposing to consolidate, and which agreement shall be ratified and confirmed by the affirmative vote of the shareholders of each such association or bank owning at least two-thirds of its capital stock outstanding. * * * Upon such a consolidation * * * the corporate existence of each of the constituent banks and national banking associations participating in such consolidation shall be merged into and continued in the consolidated national banking association *and the consolidated association shall be deemed to be the same corporation as each of the constituent institutions.* All the rights, franchises, and interests of each of such constituent banks and national banking associations in and to every species of property, real, personal, and mixed, and choses in action thereto belonging, shall be deemed to be transferred to and vested in such consolidated national banking association without any deed or other transfer; and such consolidated national banking association, by virtue of such consolidation and without any order or other action on the part of any court or otherwise, shall hold and enjoy the same and all rights of property, franchises, and interests, includ-

ing appointments, designations, and nominations and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics and in every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any such constituent institution at the time of such consolidation: * * *." 12 U.S.C. A. § 34a.

The pertinent provisions of the Revenue statutes are:

Schedule A(3) of Title VIII of the Revenue Act of 1926, as Amended by Section 723(a) of the Revenue Act of 1932, 26 U.S. C.A., Int.Rev.Acts, page 290:

"3. Capital stock (and similar interests), sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the shares or certificates mentioned or described in subdivision 2, or to rights to subscribe for or to receive such shares or certificates, whether made upon or shown by the books of the corporation or other organization, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of such share, certificate, interest, or rights, or not), on each $100 of par or face value or fraction thereof of the certificates of such corporation or other organization (or of the shares where no certificates were issued), 4 cents, and where such shares or certificates are without par or face value, the tax shall be 4 cents on the transfer or sale or agreement to sell on each share (corporate share, or investment trust or other organization share, as the case may be)."

Schedule A(9) of Title VIII of the Revenue Act of 1926, as Amended, relating to the sales and transfers of bonds, 26 U.S.C. A. Int.Rev.Acts, page 297: "9. Bonds, etc., sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the instruments mentioned or described in subdivision 1 and of a kind the issue of which is taxable thereunder, whether made by any assignment in blank or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of

such instrument or not), on each $100 of face value or fraction thereof, 4 cents."

The pertinent Regulations which are applicable to both of the preceding sections are the two exempting provisions of Treasury Regulations 71, Article 35 (h) and (q) promulgated under the Revenue Act of 1926, approved July 27, 1928, as follows:

"Article 35: Sales and transfers not subject to tax.—The following transactions are not subject to the tax:

\* \* \* \* \* \*

"(h) The transfer of shares or certificates of stock from the name of a deceased or resigned trustee to the name of a substituted trustee appointed in accordance with the terms of the trust agreement, which is a transfer resulting wholly by operation of law.

"(q) Transfers of shares or certificates of stock which result wholly by operation of law are not subject to the tax. Transfers of this character are those which the law itself will effect without any voluntary act of the parties, such as transfer of stock from decedent to executor."

The statute covering deeds of conveyance, Schedule A(8) of Title VIII of the Revenue Act of 1926, reads: "8. Conveyances: Deed, instrument, or writing, delivered on or after the 15th day after the date of the enactment of the Revenue Act of 1932 and before July 1, 1934 (unless deposited in escrow before April 1, 1932), whereby any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his, her, or their direction, when the consideration or value of the interest or property conveyed, exclusive of the value of any lien or encumbrance remaining thereon at the time of sale, exceeds $100 and does not exceed $500, 50 cents; and for each additional $500 or fractional part thereof, 50 cents. This subdivision shall not apply to any instrument or writing given to secure a debt." 26 U.S.C.A. Int.Rev.Acts, page 297.

■■ Sporadically during our history, when financial necessities created by war or as the aftermath of war have arisen, the Congress has extended the field of federal taxation to include stamp taxes similar to the foregoing. They should be distinguished from purely excise or other taxes in which stamps are used as the paraphernalia for convenient collection. These tax statutes are passed exclusively for the pur-

pose of raising revenue. Raybestos-Manhattan, Inc., v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111. The breadth of the scope of the tax as defined in the statute requires the court to be strict in subjecting transfers to the tax. Founders General Corp. v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed. 639. They cover transfers of the mere legal title to the property involved by a trustee. Hartley v. Commissioner, 295 U.S. 216, 220, 55 S.Ct. 756, 79 L.Ed. 1399.

From the reading of the foregoing excerpts from the statute, it can be seen that consideration of this case necessarily divides itself into two parts: (1) Those taxes assessed against the claimed transfer of bonds, stocks and other securities and (2) the tax assessed against the claimed transfer of the real estate. The first classification must further be subdivided between (a) those securities which the bank had in its security account in which it had both the legal and beneficial title and (b) securities to which the bank had only legal title and which it held in trust.

1. As to the first group involving the securities, the plaintiff contends the tax to be improperly levied on the ground that the transfer of such securities resulted exclusively from operation of law. It bases this contention on the two Treasury Regulations heretofore quoted. Defendant's position is that the transfer of title was not wholly resultant from operation of law but that the operation of law was the mere culmination of the voluntary acts of the stockholders and directors of the two corporations which were the true motive force in the transfer.

Plaintiff relies on United States v. Merchants Nat. Trust & Savings Bank, 9 Cir., 101 F.2d 399. The consolidation in that case was under the California bank consolidation law. § 31, California Bank Act; Deering's General Laws, 1927, Act 652, § 31. It provided, as does the act here, that "the purchasing bank shall, ipso facto and by operation of law and without further transfer, substitution, act or deed, and in all courts and places, be deemed and held to have succeeded and shall become subrogated and shall succeed to all rights, obligations, properties, assets, investments, deposits, demands, contracts, agreements, court and private trusts and other relations to any person, creditor, depositor, trustor, principal or beneficiary of any court or private trust, obligations and liabilities of

every nature," etc. That case involved only the trust assets to which the bank had legal but no beneficial title. Unquestionably, however, the basis upon which the court there decided the question was so broad as to make inevitable the conclusion that its decision would be the same as to securities contained in the bank's own investment account. The court relied upon the two exempting provisions of the Treasury Regulation heretofore cited and specifically held that a transfer under the California consolidation law was by operation of law and not by the voluntary act of the parties. It, therefore, held that Article 35 (q) of Treasury Regulation 71 applied. In addition, it held that where, under the California statute the business of the one corporate trustee was sold in solido to another trustee, the sale effected a successful resignation from its trust obligation and there was then appointed a substitute trustee who took over the trust. It concluded therefrom that Article 35 (h) of Treasury Regulation 71 controlled.

Defendant relies upon cases which, with the exception of those decided by the Court of Appeals of the Second Circuit, touch subjects so remote from the problem here as to be of no assistance in the decision of this case. In Koppers Coal & Transportation Co. v. United States, 3 Cir., 107 F.2d 706, one of the constituent corporations in a merger transferred stock it owned to the resultant corporation. This merger was under the Delaware law which contained no provision similar to the United States banking act or to the California statute. It was necessary there for the constituent corporation to transfer its stock to the resultant corporation by endorsing and delivering it to the transfer agent for the issuance of new stock. The transfer was not effected by operation of law but by the positive act of the party. The question of the transfer by operation of law was only injected into the case by the taxpayer who relied upon an entirely different regulation which covered mergers and not consolidations. The facts of that case do not touch the facts of this one at any material point.

It is in the Circuit Court of Appeals of the Second Circuit that the conflict with United States v. Merchants Nat. Trust & Savings Bank, supra, arises. That Court has held contrary to plaintiff's contention here. The first case was Weil et al. v. United States, 2 Cir., 115 F.2d 999. There the New York Mortgage Commission, act-

ing under an act passed for the relief of financial conditions during the depression, took over from the New York Superintendent of Insurance certain bonds and mortgages previously guaranteed by the New York Title and Mortgage Company. These bonds and mortgages had come into the possession of the Superintendent of Insurance under the provisions of another act which simply gave him power to take them and hold them for the protection of investors. The task of the Mortgage Commission was broader. Under the law, its duty was to reorganize as well as to administer mortgage properties and to intermediate between the Superintendent of Insurance and the trustees for reorganization to be selected by the Court. In considering this case, the Second Circuit construed the two quoted Regulations squarely in support of defendant's position here. It held that, since the transfer to the trustees on reorganization could only be made with the consent of the owners of two-thirds of the mortgage investments, there was no transfer wholly by operation of law and that the tax was properly assessed. The rule was followed later in Niagara Hudson Power Corporation v. Hoey, 2 Cir., 117 F.2d 414, for the same reasons expressed in the Weil case. Both of these cases were ones in which both legal and beneficial title were involved. In City Bank Farmers Trust Co. v. Hoey, 2 Cir., 125 F.2d 577, 579, the same question was presented except that it referred to the transfer of securities held in trust. Both of the Regulations heretofore quoted were considered by the Court. Both were rejected as inapplicable. The majority of the Court, in so deciding, stated: "We confess that it irks us to decide this issue against appellee," and "Regretfully, we hold that, on this point, the District Court erred." In a dissenting opinion, Judge Swan asserted his opinion that Article 35 (h) of Regulations 71 applied and that the Circuit Court of Appeals for the Ninth Circuit was right in its decision in United States v. Merchants Nat. Trust & Savings Bank, supra.

The situation, therefore, is that in the Second Circuit the Court unanimously and unequivocably held the tax applicable as to securities owned both legally and beneficially. On the case involving the tax on trust assets, the majority of the Court regretfully so held and the minority dissented. In the Ninth Circuit, the rule is that the transfer tax does not apply under either set of circumstances.

This Ninth Circuit decision is controlling upon me. Consequently, what I say concerning the merits of the problem need only be brief. None the less, I do venture my opinion concerning it. The problem consists solely of an analysis of the two Regulations. The question is— when the words "wholly by operation of law" are used, do they refer to the entire process of consolidation or do they refer merely to that portion of it referring to the transfer? Is the transfer separable? The importance of the two quoted Regulations makes necessary a brief discussion of the subject of administrative regulations in general. Unquestionably, this case cannot correctly be decided without some understanding of this troublesome problem.

Distinction must be made between two recognized classes of regulations. Those of the first class are promulgated under specific prospective authority from Congress granted because of Congress' recognition of the obstacles preventing it from spelling out its answers to all the problems resulting from the act. The second group are promulgated under the authority of the delegated interpretative power to assist in the execution of a statute by the administrative agency. Often the necessity for interpretation comes from intentional legislative vagueness induced by exigencies in the progress of legislative maneuvering. Gray, Nature and Sources of The Law (2d Ed.) 173. As to both groups, changing conditions and changing sets of problems make imperative some elasticity in the processes. In fact, frequently it is the recognition of the probability of changing conditions which causes the Congress to leave the task of prospectively spelling out the answers or of interpreting broad language to the administrative agency. Those regulations of the first class which text writers call legislative have the force of law upon promulgation. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563. So long as they are confined within the limits of the statutory delegation, their force will be recognized by the courts even though the courts may consider them illiberal, inequitable or not conducive to the best results. Utah Power & Light Co. v. United States, 243 U.S. 389, 410, 37 S.Ct. 387, 61 L.Ed. 791.

To the extent that changed conditions may not alter a relationship between a legislative regulation and the problem for the solution of which it was promulgated,

reenactment of the specific statute is of little weight in determining the validity of the regulation. There is no true necessity for the alarm displayed by certain writers over the apparent disparity between the rulings of the Supreme Court in Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536, and Helvering v. Wilshire Oil Co., Inc., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101. To my mind, what is needed is a rationalization of the problem by permitting the court to ascertain whether there is a factual basis on which it can be concluded that the Congress intended to reenact the Regulation when it reenacted the statute. The difficulty with the rule in the past has been the necessity for its blind acceptance by the courts. No good ever comes from obstructing the efforts of inquiring minds which seek out the truth. Basically, the problem is one of interpretation. Success in interpretative technique requires it to be keyed to the essential characteristics of the modern law-making processes. The omniscience attributed by some courts to the Congress is astounding to one experienced in the handicaps of time-pressure by which the labors of members of that body are circumscribed. It appears to me that the way towards this rationalization has been pointed by the Supreme Court in Helvering v. Wilshire Oil Co., supra, and in White et al. v. Winchester Country Club, 62 S.Ct. 425, 86 L.Ed. ——, decided January 12, 1942; and, by analogy in Interstate Commerce Commission v. Railway Labor Executives Association, 62 S.Ct. 717, 86 L.Ed. ——, decided March 2, 1942. This rationalization should apply to legislative regulations where changed conditions make the reenactment rule applicable and to all interpretative regulations.

Interpretative regulations are what Mr. Justice Jackson, in the Winchester Country Club case, characterized as "constructional crutches," and their value lies in the fact that they either are the "substantially contemporaneous expressions of opinion * * * of men who probably were active in the drafting of the statute", White v. Winchester Country Club, supra [62 S.Ct. 430, 86 L.Ed. ——], or of such long standing as to merit the particular respect of the courts. Logan v. Davis, 233 U.S. 613, 34 S.Ct. 685, 58 L.Ed. 1121; United States v. Joliet & Chicago Railroad Company, 62 S.Ct. 442, 86 L.Ed. ——, decided Jan. 19, 1942. They may be both. Magruder v. Washington, Baltimore &

Annapolis Realty Corp., 62 S.Ct. 922, 86 L. Ed. ——, decided April 13, 1942. Regulations of this type may be ignored by the court even after reenactment if they are not uniform. United States v. Missouri Pacific Railroad Company, 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322; or if they are ambiguous within themelves or are inconsistent with each other. Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S. Ct. 275, 76 L.Ed. 587. Any regulation so ambiguous and inconsistent as to be impossible of interpretation in itself is obviously valueless in its function of assisting in the understanding of the statute it was supposed to simplify. The plaintiff seeks to use the two regulations involved here for interpretative purposes. The problem in this case is to determine whether their use is proscribed by the rule in the Missouri Pacific and the Chicago Portrait cases. If they are, nothing new was added to them by the reenactment of the statute after their promulgation.

Any value for interpretative purposes possessed by these two regulations is destroyed by their own ambiguity and inconsistency. They each seek to exempt transfers resulting wholly by operation of law. They each specifically include in that category examples patently outside that category. A transfer arising from a trustee's *resignation* is never one by operation of law. Neither is one to the *executor* of an estate. Each of these transactions requires the purposeful, active intervention of one of the parties. "An estate is said to 'devolve' on another when by operation of law, and without any voluntary act of the previous owner, it passes from one person to another; but it does not devolve from one person to another as the result of some positive act or agreement between them. The word is itself of intransitive signification, and does not include the result of an act which is intended to produce a particular effect. It implies a result without the intervention of any voluntary actor. Francisco v. Aguirre, 29 P..495, 497, 94 Cal. 180; First Nat. Bank of San Jose v. Menke, 60 P. 675, 677, 128 Cal. 103, 3 Words and Phrases, First Series, page 2050," 12 Words and Phrases, Perm.Ed., p. 372. Life Estates created by marriage under Curtesy and Dower Statutes result from operation of law but those created by will do not. 17 R.C.L. 616. This because the primary purpose of the act of making the will was the creation of the estates. In a marriage that result is only incidental. The Federal

courts have recognized the distinction in those cases where under Equity Rule 27, 28 U.S.C.A. § 723 Appendix (New Federal Rules of Civil Procedure, Rule 23, 28 U.S. C.A. following section 723c) the plaintiff in a stockholder's suit is required to allege that he was "a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law." McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, 882; Whitaker v. Whitaker Iron Co., 4 Cir., 249 F. 531, 536.

It may lie within the province of Congress for tax purposes to endow transactions with legal attributes they do not possess. Credit Alliance Corporation v. Commissioner, 42 B.T.A., 1020; Helvering v. Credit Alliance Corporation, 4 Cir., 122 F.2d 361. No such power is given to the executive in the promulgation of interpretative regulations. To assume the propriety of the delegation of such power is to ignore the distinction made by Justice Cardozo in his dissent in Panama Refining Co. v. Ryan, 293 U.S. 388, 440, 55 S.Ct. 241, 79 L.Ed. 446, and his concurring opinion in Schechter Corp. v. United States, 295 U.S. 495, 551, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A. L.R. 947. As he indicated, delegated power must be canalized within banks that keep it from overflowing. It can not be unconfined and vagrant.

The further fatal weakness of plaintiff's position is that it urges me to use these unsound constructional crutches as the bases for an analogy which does not fall within the broadest possible meaning of the language of the regulation. That I can not do. Pound, Courts and Legislation, 77 Cent.L.J. 219. The intent of the Regulations is clear. It is to exempt transfers resulting wholly by operation of law. Advantage can not be taken of the use of erroneous examples in the faulty Regulations to extend their errors into fields they do not touch.

If this question was one of first impression in this Circuit, I would hold the assessments on this phase of the case to be proper. However, in view of United States v. Merchants Nat. Trust & Savings Bank, supra, judgment for the return of these particular assessments must be entered.

2. The next question involves the tax upon the real estate. It will be noted that this section of the statute is much more restricted than are the others which we have been considering. It requires that "the deed, instrument, or writing delivered

* * * whereby any lands, tenements or other realty *sold* shall be granted, assigned, transferred or otherwise conveyed to or vested in the purchaser or purchasers or any other person or persons." There are 42 Regulations applicable to this section. Counsel have referred to many of them and have argued that I should construe the statute in the light of all of them. I have patiently tried to fit together the various Regulations in an effort to evolve therefrom a pattern which would be of assistance in construction. It is clear that those who wrote the Regulations had no such pattern in contemplation. To attempt to devise such an effective pattern here is impossible. One might as well attempt to fit together a jig saw puzzle which has no pattern. Only Article 75 of the Regulations is of value. It reads:

"The act requires that the person who makes, signs or issues any instrument taxable thereunder shall affix and cancel the revenue stamps."

The only person who made, signed or issued any instrument in this transfer was the Deputy Comptroller of the Currency who signed the certificate of consolidation. Reasoning from which it might be concluded that he should have affixed revenue stamps thereon would be artificial. The only case submitted upon this phase is Carpenter v. White, 1 Cir., 80 F.2d 145. It contains nothing of value here. It involved the transfer of real estate by deeds of two corporations in a non-statutory merger. It was decided exclusively upon the question of fact as to whether or not there was consideration for these deeds. In the case at bar, the tax was improperly assessed. There was no deed, instrument or writing delivered. No lands, tenements, or other realty were sold. There was no purchaser to whom any land, tenements or realty were granted, assigned, transferred or otherwise conveyed or vested in. Of particular importance upon this point is the provision of the banking statute, 12 U.S.C. A. § 34a reading:

"The corporate existence of each of the constituent banks and national banking associations participating in such consolidations shall be merged into and continued in the consolidated national banking association *and the consolidated association shall. be deemed to be the same corporation as each of the constituent institutions.*"

An examination of the original statutes reveals that this particular provision became

a part of the act by virtue of the amendment of June 16, 1933, 48 Stat. 190. The original Act of November 7, 1918, 40 Stat. 1043, simply provided for the consolidation of national banking associations. This was enlarged by the Act of February 25, 1927, 44 Stat. 1224, to include state banks. The amendment of June 16, 1933, was a part of the general banking act of that year which involved all of the ramifications of the national banking statutes and resulted from the experiences in and lessons learned from the bank collapse in the spring of that year. I have carefully examined the legislative record endeavoring to ascertain the specific purpose of the inclusion of this particular language. I find nothing in that record which directly answers the question. However, by reading all of the debates on the floor of both Houses of Congress, I am convinced that the explanation is clear and simple. Those debates indicate clearly the knowledge of and interest in, by Members of Congress, the long-standing controversy between the national and state banking systems in this country. They show the jealousies which long existed between the two systems and the determined effort on the part of each to prevent proselyting by the other. It is apparent from the discussions that even the tragedy of the bank collapse and the hardships of the bank holiday had not resulted in a sufficient attitude of cooperation upon the part of the state banks for strengthening the banking structure of the country by means of consolidation with stronger national banks. To quote from these discussions or even to make reference to the innumerable times when this issue arose during the First Session of the 73d Congress would unduly tax this opinion. Merely by way of example, I refer to the colloquy between Senators Glass, Costigan and Cousins. Congressional Record, Vol. 77, Part 4, p. 3727, et seq.; and the colloquy between Congressmen Steagall and May, Congressional Record, Vol. 77, Part 4, p. 3837 et seq.; and the speech by Congressman Patman, Congressional Record, Vol. 77, Part 4, p. 3840 et seq. To one familiar with the course of procedure of Congressional debates and the methods used by the Congress in the accomplishment of results, it is apparent that this particular amendment was injected into the law to speed up state and national consolidations. It is a difficult statute to interpret. For a new corporation to be created and to be deemed the same corporation as each of the constituent institutions, which constituents are to be continued in the consolidated corporation, is an anomaly in the law. When Koppers Coal & Transportation Co. v. United States, supra, was presented to the Circuit Court of Appeals for the Third Circuit, counsel for the taxpayer urged that the same result had occurred under the Delaware Statute which contained no such provision. Judge Biggs emphatically rejected the theory on the ground that it was "metaphysical." The action of the Congress, in writing it into the Federal statute takes it out of the realm of metaphysics. Regardless of how the statute might be characterized, unquestionably in consolidations effected under it, there was no grant, assignment, transfer or conveyance of real estate on which the stamp tax provided by Schedule A, Title VIII of the Revenue Act of 1926, as amended, could be assessed.

3. Plaintiff further seeks recovery of the amount paid on the compromise settlement of criminal liability under § 802 of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Acts, page 285. Since I have held that there was no tax due, the logic of the situation would seem to indicate that plaintiff's claim should be granted. However, that is not the law. Compromises authorized by 26 U.S.C.A. Int.Rev.Code 3761 (a) are binding and final. Backus v. United States, Ct.Cl., 59 F.2d 242, certiorari denied 289 U.S. 610, 53 S.Ct. 402, 77 L.Ed. 984; Walker v. Alamo Foods Co., 5 Cir., 16 F. 2d 694, certiorari denied 274 U.S. 741, 47 S.Ct. 587, 71 L.Ed. 1320; Shaw & Truesdell Co. v. United States, D.C., 1 F.Supp. 834. Such a result in this case is unfortunate. The highly debatable character of this assessment should have induced the Collector to desist from his threats of criminal prosecution. They smack too much of the political philosophy of subservience of the individual to the state which today threatens the world. Public officials in a democracy should learn that only those deserve power who are willing to use it sparingly.

Judgment will be entered in accordance with this opinion.