**STANTON BREWERY, Inc., v. COMMIS-
SIONER OF INTERNAL
REVENUE.**

No. 271, Docket 21287.

United States Court of Appeals
Second Circuit.

Argued June 8, 1949.

Decided July 25, 1949.

LEARNED HAND, Chief Judge, dissenting.

Elden McFarland, of New York City
(G. A. Donohue, of New York City, on the
brief), for petitioner.

Melva M. Graney, Sp. Asst. to the Atty.
Gen. (Theron Lamar Caudle, Asst. Atty.
Gen., and Ellis N. Slack and Lee A. Jackson, Sp. Assts. to the Atty. Gen., of Washington, D. C., on the brief), for respondent.

Before L. HAND, Chief Judge, and
CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

The Commissioner of Internal Revenue
determined a deficiency in petitioner's excess profits tax for 1942, which, as adjusted, was approved in a decision reviewed by the entire Tax Court, 11 T.C.
310, on the facts as stipulated. This petition for review raises the single issue
whether or not, after a merger, the resulting corporation is entitled, in determining
its adjusted excess profits net income, to
carry over the unused excess profits credit

of one of its components for the two years preceding the merger.

Petitioner was formed by a merger of The John Stanton Brewing and Malting Company and The Stanton Brewery, Inc., both New York corporations, under § 85 of the N. Y. Stock Corporation Law, McKinney's Consol.Laws, c. 59. The merger took place on December 31, 1941. The original Stanton Brewery, Inc., had been an operating company, all but one hundred of its shares being held by The John Stanton Brewing and Malting Company. Immediately before the merger, the holding company acquired the last one hundred shares, in exchange for previously authorized shares of its own stock. Upon the merger, the new company took the name of the operating company. In determining its adjusted excess profits net income for 1942, the first year of its existence, the new company deducted the unused excess profits credits of its component corporations for 1940 and 1941. The Commissioner disallowed the deduction of the operating company's credits, which were sufficient, either in 1940 or 1941, to cancel out the 1942 excess profits tax liability. The approval of the Commissioner's determination by the Tax Court led to this petition for review.

■ As is well known, Congress sought by the excess profits tax, I. R. C. §§ 710–736, 26 U.S.C.A. §§ 710–736—imposed in 1940 and repealed in 1945—to capture for the government the amount of corporate profits of any one year which were excessive in relation to the like receipts during an earlier or base period (normally 1936-1939). But it was considered equitable that lean years should be set off against lush ones to strike some sort of average, and hence we have the device of the "unused excess profits credit carry-back and carry-over" from one tax year to another. Here we are interested only in the carry-over. In circumstances such as are here disclosed the statutory scheme operated as follows: To reduce the excess profits net income, as defined in I. R. C. § 711, to the adjusted excess profits net income, upon which the excess profits tax was based, I. R. C. § 710(b) provided for three deductions: (1) a specific exemption (then $5,-000); (2) an excess profits credit, as defined in §§ 712 and 713, amounting to 95 per cent of the average base period net income, with certain adjustments; and (3) an unused excess profits credit adjustment, computed under § 710(c), which defines it as "the aggregate of the unused excess profits credit carry-overs and unused excess profits credit carry-backs to such taxable year." "Unused excess profits credit" is defined, in § 710(c) (2), as "the excess, if any, of the excess profits credit for any taxable year beginning after December 31, 1939, over the excess profits net income for such taxable year." Subsec. (c) (3) (B) provides further that "If for any taxable year beginning after December 31, 1939, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-over for each of the two succeeding taxable years." Petitioner's claim is that, as "the taxpayer" in the quotation, it is entitled to the carry-over from its component operating company's unused excess profits credit. We are constrained to agree.

The issue as so stated is thus seen to turn upon the nature of merged corporations after a merger. At the outset we find ourselves confronted with one of those questions of legal semantics or categorization which constantly dog the judicial process. For here the decision seems to be sought in terms of which legal entity swallowed the other. Moreover there appears to be the further assumption, on the part of respondent, that necessarily the inactive holding company—which lost its identity in the other so far at least as its name is concerned—swallowed the really active part of the enterprise, so that an important privilege of the latter, taxwise, is irrevocably lost. And it seems that, had the converse been true and the swallower originally had the privilege, it would still be retained. While nowhere stated in these exact terms, this does appear to be the premise of the Commissioner as accepted by the Tax Court. Thus in his original Statement to "The Stanton Brewery, Inc. (Formerly The John Stanton Brewing and Malting Co.)" he allowed it a

small credit "Unused—available for carry-over to 1942," but went on to say "that you are not entitled to deduct, in determining your adjusted excess profits net income, the unused excess profits credit of your dis-solved subsidiary for the years 1940 and 1941 under the provisions of section 710 of the Internal Revenue Code."· And now his counsel refers to the "taxpayer" as though steadily in existence throughout the period, defines the latter's claim as one for the unused credits of "its" subsidiary for 1940 and 1941, and asserts that "tax-payer is not in fact 'the taxpayer' which had unused excess profits credits in 1940 and 1941."

██ If there were real substance, for present purposes, to this conception of a corporate merger as a continuance of ex-istence of the dominant corporation only, it would seem more in accord with busi-ness realities here to say that the larger and active operating business had taken over the inactive entity. It is true that upon his assumption the Commissioner may seem to avoid the dilemma of holding that a substantial tax credit is harshly de-stroyed by a comparatively minor change in corporate form. He at least can assert —as he does on the basis particularly of New Colonial Ice Co. v. Helvering, 292 U. S. 435, 54 S.Ct. 788, 78 L.Ed. 1348—that the legal entity having the credit is now gone. But even upon his, to us, dubious assump-tion, we do not think he really avoids it, for he still employs a mere change in cor-porate form—of a slightly different nature, but still capable of avoidance by skillful ·

legal manipulation—to bring about a yet more arbitrary destruction of a credit as to one only of two or more component parties to a merger. We doubt, therefore, that any of these linguistic formulae suggests a really fruitful approach to the solution of our present problem. More properly we must regard the "resulting corporation" as the union of component corporations in-to an all-embracing whole which absorbs the rights and privileges, as well as the ob-ligations, of its constituents.[1]

That the corporation resulting from a merger takes on the obligations of its com-ponents directly by operation of law is clear on the authorities. In Commissioner of Internal Revenue v. Oswego Falls Corp., 2 Cir., 71 F.2d 673, 676, this court held that the resulting corporation after a merger under the same New York statute as involved here was primarily liable for the tax obligations of a component, as "the taxpayer" and not secondarily as a trans-feree after a purchase. Cf. United States v. Oswego Falls Corp., 2 Cir., 113 F.2d 322; A. D. Saenger v. Com'r, 38 B.T.A. 1295, 1302. In Adrian & James, Inc., v. Com'r, 4 T.C. 708, 719, the Tax Court held that a continuing corporation, after a mer-ger under the Delaware General Corpora-tion Law, which paid the income tax liabil-ity of a component was entitled to a deduc-tion under § 406 of the Revenue Act of 1938, as in payment of its own liability. The Koppers Coal Co. v. Com'r, 6 T.C. 1209, 1223, is in accord, as are the cases upholding jurisdiction of petitions by a resulting corporation as "the taxpayer" for

---

[1] For his conclusion the Commissioner has relied on a statutory definition of "acquiring corporation" which, as we point out below, is set forth later in the statute in connection with an alternative method for the computation of average base period net income; but even there it is carefully limited to the corporation which is "the result of a statutory merg-er of two or more corporations" while the "component corporations" are all the corporations merged, except the corpora-tion "resulting" from the merger. I. R. C. § 740(a) (3) and (b) (3), 26 U.S. C.A. § 740(a) (3), (b) (3), discussed in-fra. The Commissioner wisely does not rely on N. Y. Stock Corporation Law § 85; whether in any event such a state statute should control the meaning of a federal revenue law, obviously the terms there used, apparently as convenient symbols only, of "possessor corporation" and "merged corporation" are not geared to the subtle nuances of this tax statute. Indeed, such a contention, if made, would prove too much. Thus, note the provi-sion relied on by petitioner, that, upon the filing of the appropriate certificate with the state secretary of state, the pos-sessor corporation shall succeed not only to all the liabilities and obligations of the merged corporation, but also to all its estate, property, rights, privileges, and franchises "without change or diminu-tion."

review of deficiencies determined against its components. Alaska Salmon Co. v. Com'r, 39 B.T.A. 455; Skaneateles Paper Co. v. Com'r, 29 B.T.A. 150. All these decisions deal with the substance of the transaction and are not to be brushed aside by the oversimplified formula suggested by the Commissioner—in line with his assumed premise stated above—that involved only was the continued corporation, and not the merged or submerged one.

The question of the resulting corporation's right to deduct unamortized bond discount and expense on obligations of its components has aroused considerable judicial discussion. In New York Cent. R. Co. v. Commissioner of Internal Revenue, 2 Cir., 79 F.2d 247, 249, certiorari denied 296 U.S. 653, 56 S.Ct. 370, 80 L.Ed. 465, our brethren distinguished the consolidation there from a purchase, yet turned their decision, allowing the deduction, on the rationale that "no loss was sustained by the issuing corporations in selling their bonds at a discount; the loss will be sustained by the consolidated corporation when the bonds mature and are paid." But in Helvering v. Metropolitan Edison Co., 306 U.S. 522, 529, 59 S.Ct. 634, 638, 83 L.Ed. 957, the Supreme Court, approving the result in the New York Central case, declared that in the merger situation, as opposed to the sale, "the corporate personality of the transferor is drowned in that of the transferee." And since the transaction had "all the elements of a merger," it allowed the deduction.

Respondent's reliance on the dictum in the New York Central case, supra, 79 F.2d at page 249, to the effect that losses sustained by a predecessor may not be deducted by a successor is therefore ill-placed, since all the cases cited in its support, and independently stressed by respondent, deal with succession by purchase and contract, rather than by operation of law. This is, in fact, a distinction of which the court in the New York Central case was clearly aware, since in the preceding paragraph it cited its earlier decisions making the distinction. Commissioner of Internal Revenue v. Oswego Falls Corp., supra; Cortland Specialty Co. v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 937, 939, certiorari denied 288 U.S. 599, 53 S.Ct. 316, 77 L.Ed. 975.

Respondent also relies on cases such as Jones v. Noble Drilling Co., 10 Cir., 135 F.2d 721, and Marion-Reserve Power Co. v. Commissioner, 1 T.C. 513, holding that the resulting corporation, after a state statutory merger or consolidation, is not entitled, in computing its income tax, to a deduction for the unused dividends paid credit of a component corporation, under I.R.C. §§ 26 and 27, 26 U.S.C.A. §§ 26, 27. But, unlike § 710, these sections refer to the credit as belonging to "the corporation" rather than to "the taxpayer," so that difficult and complex questions of corporate identity are raised, which are unnecessary to the simple determination of the locus of corporate rights and liabilities. "Taxpayer" is defined as "any person subject to a tax imposed by this title" by I.R.C. § 3797, 26 U.S.C.A. § 3797, which also defines "person" to include "corporation." Here the resulting corporation is liable for the taxes imposed upon its components, whatever may be the merits of the academic controversy over their fate. When the Supreme Court, in the Metropolitan Edison case, supra, spoke of the component corporate personalities as being drowned, it found it unnecessary to speculate on the nature of the sea changes that might ensue thereafter.

Hence we conclude that under the natural interpretation of § 710 petitioner, who has absorbed the two former corporations, is "the taxpayer" now obligated to pay their taxes and entitled to their credits. Indeed, we doubt if the matter would have been open to serious question except for a later provision of the statute which is the chief reliance of both the Commissioner and the Tax Court. This is a provision in "Part II.—Rules in Connection with Certain Exchanges," intended as a further act of grace in these "exchanges," but now used as the basis for a claim of restricted meaning as to matters not particularly covered therein. The important provision is I. R. C. § 742, 26 U. S.C.A. § 742, which prescribes an alternative method for the computation of aver-

age base period net income, in the case, among others, of a corporation resulting from a statutory merger. The method permits inclusion of the excess profits net incomes of the components in determining the base. Respondent argues that, since the section makes no provision for carry-overs from the components to the resulting corporation, none can be assumed. But the provision for carry-overs in general is in an entirely different and quite distant part of the statute, namely, § 710; and if adequate provision is made there, it is unnecessary elsewhere. Nor can we say that the distinctions made in § 740, for the purposes of the § 742 calculations, between the "acquiring corporation," which is defined to include the corporation resulting from a merger, and the "component corporations" are applicable in an entirely different context in § 710, to preclude identification of the resulting corporation with "the taxpayer" liable for the tax and entitled to the carry-over. The purpose of § 742, and its associated definitional section, as indicated by U.S.Treas. Reg. 112, § 35.740-1, is merely to provide an alternative method for computation of one element in the tax base. It should not be read to limit the meaning of other sections.[2]

Respondent's final argument is an attempt to find a clear congressional intent that the general carry-over provisions should not apply to mergers, in the later enactment of a special carry-over relief measure for railroad reorganizations. Pub. L.No.189, 80th Cong., 1st Sess., Act of July 15, 1947, c. 249, 61 Stat. 324, § 1, 26 U.S.C.A. § 122 note. We may pass the point whether such a later statute may control the meaning of this earlier Act— now already repealed—since we think the intent, if any, revealed by the statute suggests the opposite conclusion. The House Report, No. 624, 80th Cong., 1st Sess., U.S. Code Cong.Serv. 1297, explains, at page 1, that "Under existing law, if a railroad corporation is reorganized in a receivership proceeding or in a proceeding under section 77 of the National Bankruptcy Act, as amended [11 U.S.C.A. § 205], and the reorganization is effected through the organization of a new corporation, any carry-overs of net operating losses or unused excess profits credits of the old corporation cannot be used by the new corporation. The reorganized corporation is regarded as a different taxpayer from the old corporation. Consequently, railroads coming out of receivership or bankruptcy proceedings are treated differently, depending upon whether they can be reorganized under the same charter or under a new charter. The bill removes this discrimination."

■ The purpose of the bill, therefore, was limited to remedying inequalities of treatment among the railroads in reorganization, where the reorganized corporation was not regarded as the same taxpayer. We do not think it throws light upon the situation where a corporation resulting from a merger has been recognized on the authorities as the same taxpayer as its component corporations.

■ Our conclusion that petitioner is entitled to the unused excess profits credit carry-overs of its component corporations seems to us, therefore, the reasonable interpretation of the statutory language. Moreover it seems to us the one which will carry out the evident statutory purpose, since it accords the privileges of the carry-over provisions to what is essentially a continuing enterprise, entitled to all their benefits in ameliorating otherwise harsh tax consequences of fluctuating profits or expanding business. In view of this decision we need not consider petitioner's alternative claim to the credit carry-over

---

[2] It should be noted that, as pointed out, note 1 supra, these definitions do not aid the Commissioner in the premise he has chosen, for they distinguish between the resulting corporation and all the merged corporations. They do not suggest that one of the former corporations alone is to be singled out for preferred treatment; indeed their whole purport is to the contrary, that for the purposes of the excess profits credit allowance (at least, as we interpolate), the taxpayer had existed during the base period through its component corporations. I. R. C. § 740(f) and see also I. R. C. § 712(d).

under its view that the § 740 definitions are, in any event, to be considered as carried back into § 710.

Decision reversed; deficiency expunged.

LEARNED HAND, Chief Judge (dissenting).

A statute so intricate and detailed as this leaves little latitude for interpretation. Moreover, I do not think that it is more consistent with any declared purpose that I can find, to extend the privilege of a "carry-over" to the taxpayer at bar. Indeed, as the decisions cited in my brothers' opinion show, privileges, closely akin in purpose to this, are ordinarily lost by transfers by one corporation to another; and the form of the transfer cannot be important. We have no warrant for supposing that Congress in general regards such credits as parts of a "universitas juris," passing, with the chattels, choses in action and the rest, like good-will or trade-marks. Section 710(a) (1) (A) of the Act imposed a tax of 90 percent of the "adjusted excess profits net income"; it was a tax designed substantially to confiscate any profits which might be attributable to the war. Section 710(b) defined what the "adjusted excess profits net income" was to be: three items were to be deducted from "excess profits net income," of which the second was of the "excess profits credit" and the third, the "unused excess profits credit." It is not relevant here to trace out in detail the provisions which defined the second item; it is enough that the object was to find a standard income, based upon pre-war years, and allow it as a deduction from the income, as ordinarily computed, before confiscating substantially the whole of any surplus. The third deduction is the one here involved and was an added protection: if in the two preceding years a corporation's income had not been so high that, in order to escape the excess profits tax, it had to avail itself of the whole second deduction, it might in the succeeding year deduct any part of that deduction which had been left over.

Throughout Part I the assumption was that during the "base years" the corporation had not taken over the business of another corporation, although § 712(d) and § 713(d) (4) did refer to the provisions of "Part II.—Rules in Connection with Certain Exchanges", which deal with such situations. Section 742 lays down how to ascertain the "Supplement A Base Period Net Income" of a taxpayer which is an "acquiring corporation." Again, the details are not important, except that they require the incomes of the "acquiring corporation" and of all "component corporations" during the four "base years" to be added together and divided by four. An "average base period net income" will then emerge, which is the "average base period net income" on which the "excess profit credit" of the "taxpayer" is to be computed under § 713. This "excess profits credit" will then become the second deduction of § 710(b), provided it is greater than the income of the "acquiring corporation" alone, as computed under § 713. So far, I think, we all agree; we differ as to how the third deduction—the "unused excess profit credit"—shall be computed.

As I have said, that deduction is what is left over of the "excess profits credit" after it has been used in two earlier years upon the taxpayer's income. In the case at bar the income upon which the credit was used in 1942 had no equivalent in the two earlier years, because the "acquiring" and the "component" corporations were then separate businesses. Each did of course have its own "excess profits credit," based upon its separate business during the "base years," and its own separate income in the two years to be deducted from that credit; but that was all. Even though we were to assume that the "excess profit credit" computed under § 742 might be used in 1940 and 1941, we could not use it to establish a "carry-over," computed by its use upon the separate incomes in those years. Only if we computed a joint income of both corporations, based upon the added fiction that the merger was in existence in 1940 and 1941, could the "excess profits credit," computed under § 742, become relevant to a "carry-over." I do not forget that § 742 does contemplate the use of a fiction; but it does so

only as an act of grace, an option; and in order to ease the burden of the tax. The "acquiring corporation" was free at its election to disregard that fiction; it might state its tax without recourse to an "excess profits credit," as computed under § 742. I can find no warrant for adding a second act of grace implemented by a second fiction—that the corporations were merged during 1940 and 1941—in order to grant a "carry-over" in addition to the option given by § 742. Not only is there no language to support such a favor with its appurtenant fiction; but, as I have said, there is nothing in the past treatment of similar taxes that leads me to believe that Congress would have wished it so.

It seems to me so plain that in this case the combination effected on December 21, 1941, between the parent and the subsidiary was a "merger" within the meaning of § 740(a) (3) and § 740(b) (3) that I shall not labor the point. Nor do I think it necessary to discuss the argument depending upon the use of the word, "taxpayer," or its definition in § 3797(a) (14).