OLD NATIONAL BANK IN EVANSVILLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61517. Filed August 28, 1957.

*Stuart E. White, Esq.*, for the petitioner.
*William A. Goffe, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the income and excess profits tax of the petitioner, as follows:

| Year | Deficiency |
|------|-----------|
| 1951 | $9,079.40 |
| 1952 | 2,391.96 |

The issues are (1) whether the petitioner, in computing its excess profits tax, can apply the unused excess profits credit of a bank which was consolidated with petitioner; (2) whether the petitioner, in computing the net capital addition for the taxable year by showing a decrease in inadmissible assets, can include cash and loans as operating assets within the meaning of section 435 (g) (10) (B) of the 1939 Code,[1] and, in the alternative, whether the limitations of section 435 (g) (10) are applicable to section 435 (g) (9) (B) ; and (3) whether the petitioner, in computing its excess profits credit by the average income method, can use the base period capital additions of a corporation with which it was consolidated in a part II transaction (secs. 461–465), when that other corporation used the growth formula in computing its own average base period net income.

### FINDINGS OF FACT.

Most of the facts were stipulated and the stipulated facts are found accordingly.

Old National Bank in Evansville filed its Federal income and excess profits tax returns for the year 1951 with the then collector of internal revenue and for the year 1952 with the district director of internal revenue at Indianapolis, Indiana.

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

Old National Bank in Evansville was organized August 16, 1923, under the laws of the United States. By an agreement, effective August 16, 1950, with the North Side Bank in the same city, the latter bank was consolidated with, and under the charter of, the Old National Bank in Evansville. By an agreement, effective May 1, 1951, with the Franklin Bank and Trust Company in the same city, the latter bank was consolidated with, and under the charter of, the Old National Bank in Evansville.

On the date of the latter consolidation, the Franklin Bank and Trust Company, after applying its unused excess profits credit to the year 1950, had an unused excess profits credit amounting to $9,286.72. Petitioner, in computing its excess profits tax for the year 1951, claimed $7,348.24 as an unused excess profits credit, representing the unused excess profits credit of the Franklin Bank and Trust Company.

The North Side Bank, prior to the consolidation, computed its excess profits tax credit under the provisions of sections 435 (e) and 462 (c) (1) (C). In 1951 and 1952, the petitioner, in computing its base period capital additions, used the base period capital additions of the North Side Bank.

In computing its excess profits tax credit for the years 1951 and 1952, the petitioner did not apply the limitation contained in section 435 (g) (10) to the capital additions resulting from decreases in inadmissible assets.

## OPINION.

The first question is whether petitioner succeeds to the pre-consolidation unused excess profits credit of the Franklin Bank and Trust Company. Section 432 (c) (2) provides, in part:

If for any taxable year ending after June 30, 1950, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-over for each of the five succeeding taxable years, * * *

Petitioner argues there was a statutory[2] merger of the Franklin Bank and Trust Company with petitioner which extinguished the former bank and left petitioner the continuing corporation and after such a merger the continuing corporation is the "taxpayer" within the above statute and can use the credit of its constituent which is an integral part of the continuing corporation. Some of the authorities cited by petitioner give color to its claim. See *E. & J. Gallo Winery* v. *Commissioner*, 227 F. 2d 699, reversing a Memorandum Opinion of this Court, and *Stanton Brewery, Inc.* v. *Commissioner*, 176 F. 2d 573, reversing 11 T. C. 310. However, the recent decision of the Supreme Court of the United States in *Libson Shops, Inc.* v.

[2] 12 U. S. C., sec. 34 (a).

*Koehler*, 353 U. S. 382, is, we feel, conclusive authority against petitioner's position.

The *Libson* case presented a situation of a net operating loss deduction carryover under the provisions of section 122 (b) (2) (C) providing, in part, as follows:

> If for any taxable year beginning after December 31, 1947, and before January 1, 1950, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the three succeeding taxable years * * *

In the *Libson* case, there were 17 separate corporations, with the stock owned directly or indirectly by the same individuals in the same proportion. They all merged into one and the question was whether the continuing corporation could deduct the premerger net operating losses of 3 of the corporations from the postmerger income through the use of the net operating loss carryover provisions.

It must be admitted (and the parties here do not argue otherwise) that the evident statutory purpose of the two quoted statutes, dealing with the carryover of an unused excess profits credit and the carryover of a net operating loss, is identical. They are both designed to give the taxpayer some relief from what would otherwise be harsh consequences of fluctuating profits in a continuing enterprise.

In the *Libson* case, the Supreme Court held the petitioner was "not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses."

The same must be said of the instant case. The income against which the offset is claimed was not produced substantially by the same business which had the excess profits credit. The opinion in the *Libson* case pointed out that there was no indication in the legislative history of the carryover and carryback provisions that "these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business."

The legislative history with respect to the provisions for carryover and carryback of unused excess profits credit is similar to the legislative history for provisions for carryover and carryback of net operating loss. In fact, the Report of the Ways and Means Committee on section 432 (81st Cong., 2d Sess., H. Rept. No. 3142) points out the law produces the same "averaging period used under the net operating loss carry-over for both income and excess profits tax purposes."

In principle, the question presented here was decided adversely to petitioner's contention in *Libson Shops, Inc., supra*, and we there-

fore hold respondent was right on the first issue and the pre-consolidation unused excess profits credit of Franklin Bank and Trust Company was not available to petitioner after the consolidation.

Section 435 outlines the method for computing the excess profits credit based on income. Subsection 435 (g) (9) [3] deals with the effect on the credit computation of a decrease in the taxpayer's inadmissible assets for the taxable year. Subsection 435 (g) (10) [4] is concerned with certain exceptions and limitations to the adjustments made under subsection 435 (g) (9). Petitioner, as a bank, determined its adjustment due to a decrease in inadmissible assets under subparagraph (B) of subsection 435 (g) (9). Petitioner here

---

[3] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.
  (g) NET CAPITAL ADDITION OR REDUCTION.—

    *         *         *         *         *         *         *

    (9) DECREASE IN INADMISSIBLE ASSETS.—
      (A) Except as otherwise provided in subparagraph (B) (relating to banks), the excess of the amount computed under paragraph (2) (A) or (B), whichever is applicable to the taxpayer (whether or not any amount is determined under the first sentence of paragraph (2)), over the amount, if any, computed under the first sentence of paragraph (2) shall be considered the net capital addition for the taxable year or shall be added to the net capital addition otherwise determined under paragraph (1), as the case may be. The amount of the excess so determined shall be subject to the exceptions and limitations provided in paragraph (10).
      (B) In the case of a bank (as defined in section 104), the computation under subparagraph (A) shall be made by substituting for the amount computed under paragraph (2) (A) or (B) whichever of the following amounts is the lesser:
        (i) An amount which bears the same ratio to the decrease in inadmissible assets as the sum of the equity capital (as defined in section 437 (c)) and the daily borrowed capital (as defined in section 439 (b)), each determined as of the first day of the first taxable year ending after June 30, 1950, bears to the total assets as of the beginning of such day;

[4] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.
  (g) NET CAPITAL ADDITION OR REDUCTION.—

    *         *         *         *         *         *         *

    (10) EXCEPTIONS AND LIMITATIONS FOR THE PURPOSE OF PARAGRAPH (9).—For the purpose of paragraph (9)—
      (A) The adjustment to the decrease in inadmissible assets required under subparagraph (B) of paragraph (2) shall not be greater than 25 per centum of the excess of the net capital reduction computed under the first sentence of paragraph (2) (and computed without regard to the percentage limitations in paragraph (4) (C) and (E)) over the net capital reduction computed under such sentence without regard to paragraph (4) (C) and (E).
      (B) The amount determined under paragraph (9) shall not be greater than the excess of the increase in operating assets for the taxable year over the net capital addition (determined without regard to paragraph (9) and determined without regard to the limitation to 75 per centum provided in paragraph (3) (C) and paragraph (4) (C) and (E)). For the purpose of the preceding sentence, the increase in operating assets for the taxable year shall be determined in the same manner as the increase in inadmissible assets for the taxable year is determined under paragraph (5). For the purpose of such determination, the term "operating assets" means—
        (i) property used in the taxpayer's trade or business within the meaning of section 117 (j) (1) except that such property need not be held more than six months, and
        (ii) stock in trade or other property of a kind which would properly be includible in the inventory of the taxpayer if owned at the close of the taxable year, and property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business,
    except any such assets which constitute inadmissible assets, stock, securities, or intangible property (such intangible property not being limited to the property described in section 441 (i)).

contends that subsection 435 (g) (10) is not a limiting factor for banks coming under paragraph (B) of subsection 435 (g) (9). Its argument is based on the wording of subsection 435 (g) (9) and also on certain legislative history.

We cannot agree that the wording of subsection 435 (g) (9) supports the petitioner's argument. The last sentence of paragraph (A) of subsection 435 (g) (9) provides that the "amount of the excess so determined shall be subject to the exceptions and limitations provided in paragraph (10)." Under subparagraph (B) it is provided that in the case of a bank "the computation under subparagraph (A)" shall be made by the use of certain substitute amounts. Thus, it is clear that paragraph (B) relates back to paragraph (A), and consequently is within the exceptions and limitations provided in subsection 435 (g) (10).

Also, the language found in subsection 435 (g) (10) does not support petitioner's argument. This subsection, after the heading "Exceptions and Limitations for the Purpose of Paragraph (9)," introduces paragraph (A) with the words "For the Purpose of Paragraph (9)." Also, paragraph (B) begins with the words "The amount determined under paragraph (9) shall." Thus it is evident that the exceptions and limitations laid out in subsection 435 (g) (10) apply to both paragraphs (A) and (B) of subsection 435 (g) (9). We have, furthermore, examined all the applicable legislative history and we do not anywhere find support for the argument advanced by the petitioner. S. Rept. No. 781, Part 2, 82d Cong., 1st Sess., 1951–2 C. B. 545, 608 (explaining section 507 of H. R. 4473, which became subsections 435 (g) (9) and (g) (10)).

Petitioner, in the alternative, argues that if we should find, as we do, that subsection 435 (g) (10) is applicable to all of subsection 435 (g) (9), it was the congressional intent that "operating assets," as that term is used in subsection 435 (g) (10) (B) (ii), should include petitioner's items "cash and due from banks" and "loans and discounts." Briefly, petitioner contends that "operating assets" of a bank include cash and loans. We cannot agree. Subsection 435 (g) (10) (B) defines "operating assets," for the purpose of the determination under that subsection, as:

(i) property used in the taxpayer's trade or business within the meaning of section 117 (j) (1) except that such property need not be held more than six months, and

(ii) stock in trade or other property of a kind which would properly be includible in the inventory of the taxpayer if owned at the close of the taxable year, and property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business,

except any such assets which constitute inadmissible assets, stock, securities, or intangible property (such intangible property not being limited to the property described in section 441 (i)).

The regulations under these sections specifically exclude cash as an operating asset.[5] We believe that the respondent's regulations correctly interpret the scope of the term "operating assets." In section 507 of a supplemental report of the Senate Finance Committee there are specifically excluded from the term "operating assets" the items "inadmissible assets, stock, securities, and intangible property (*such as evidence of indebtedness*)." (Emphasis supplied.) S. Rept. No. 781, Part 2, 82d Cong., 2d Sess., 1951–2 C. B. 545, 608. It is obvious, therefore, that Congress intended to eliminate loans from the scope of operating assets. Nor do we think that the item "cash" is the type of property includible in "operating assets" as that term is used in section 435 (g) (10) (B). Cash, in the hands of a bank, cannot be considered as a type of property which is held for sale to customers or includible in inventory. A bank, for the most part, renders services of a financial nature, and we think that petitioner's analogy of a mercantile-type establishment is misleading. A bank cannot be said to be engaged in the sale of cash to its customers, nor do we think that cash can be considered "property used in trade or business" within the meaning of sections 435 (g) (10) (B) and 117 (j) (1).

A third issue also involves the computation of the petitioner's excess profits credit for the taxable years. Petitioner, an "acquiring corporation" within the meaning of section 461 (a) (3), computed its excess profits credit under the provisions of chapter 1, subchapter D, part II. The North Side Bank, a "component corporation" within the meaning of subsection 461 (b) (3), computed its average base period net income, prior to the consolidation, under the so-called growth formula. Sec. 435 (e). Petitioner, in computing its credit under the average income method, sought to take advantage of the base period capital additions of its component corporation, the North Side Bank, under section 464. Section 464 provides, in part, as follows:

SEC. 464. CAPITAL CHANGES DURING THE BASE PERIOD.

For the purposes of section 435 (f), if the transaction which constitutes the taxpayer an acquiring corporation occurred during or after the beginning of the second taxable year preceding the first taxable year of the acquiring corporation under this subchapter, and the acquiring corporation's average base period net income is computed by application of this part, the following rules shall apply in computing the base period capital addition of such acquiring corporation:

---

[5] Regulations 130, sec. 40.435–7.

(g) DECREASE IN INADMISSIBLE ASSETS.—

(1) IN GENERAL.—* * * The term "operating assets" means (i) property used in the taxpayer's trade or business within the meaning of section 117 (j) (1) determined without regard to any holding period specified in such section, and (ii) stock in trade or other property of a kind which would properly be includible in the inventory of the taxpayer if owned at the close of the taxable year, and property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business. Such term does not include cash, inadmissible assets, stock, securities, or intangible property, whether or not such intangible property is described in section 441 (i). * * *

(a) In the case of a transaction, other than a transaction described in section 461 (a) (1) (E), which—

(1) occurred during or after the first taxable year of the acquiring corporation under this subchapter, for the purposes of section 435 (f), the base period capital addition of the acquiring corporation for the taxable year in which the transaction occurred shall be the sum of:

(A) the base period capital addition of the acquiring corporation, and

(B) so much of the base period capital addition of a component corporation as is proportionate to the ratio which the number of days in the taxable year of the acquiring corporation after the transaction bears to the number of days in such taxable year;

and the base period capital addition of the acquiring corporation for any taxable year thereafter shall be the aggregate of the base period capital addition of the acquiring corporation and the base period capital addition of such component corporation.

It is obvious that these adjustments for base period capital additions are to be made for "the purposes of section 435 (f)." Section 435 (f) outlines the method of computing capital additions in the base period. Such capital additions, as pointed out above, enter into the computation of excess profits credit under the average income method, but do not enter into the computation of the credit based on growth which in reality is an alternative method. There is no reference in section 464 (a) (1) to section 435 (e). We agree with the respondent that it would be inconsistent to allow a taxpayer, computing its credit under the average income method, to use the base period capital additions of a taxpayer which has chosen the benefits of the growth formula in its prior excess profits tax returns. Respondent has embodied this interpretation of the pertinent sections in his regulations. Regs. 130, sec. 40.464–1.[6] Our examination of the statute convinces us that this regulation is not unreasonable or inconsistent with the statute, and is, therefore, valid. *Fawcus Machine Co.* v. *United States*, 282 U. S. 375.

*Decision will be entered for the respondent.*

---

[6] * * * No base period capital addition shall be allowed the acquiring corporation with respect to any corporation a party to the Part II transaction (whether the acquiring or component corporation) the monthly excess profits net income of which is computed under section 435 (e) and section 462 (c) (1) (C) * * *