*Decision will be entered under Rule 50.*

DUMONT-AIRPLANE & MARINE INSTRUMENTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 59508, 60752.    Filed September 30, 1957.

*Lincoln Stevenson, Esq.*, for the petitioner.
*Emil Sebetic, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the petitioner's income and excess profits taxes for the years 1951, 1952, and 1953, as follows:

| Year | Deficiency |
|------|-----------|
| 1951 | $35,446.59 |
| 1952 | 40,948.65 |
| 1953 | 9,430.93 |

The petitioner conceded that certain adjustments made by the Commissioner were correct. There are two issues left for decision: (1) Whether the Commissioner properly determined the petitioner's basis in the Clearfield Plant buildings for the purpose of depreciation and for computation of the petitioner's excess profits credit based on invested capital; and (2) whether it was proper for the petitioner, in computing its unused excess profits credit adjustment for 1952, to use the unused excess profits credit of a corporation, the net assets of which the petitioner acquired in 1953 in a tax-free reorganization, and which corporation was immediately thereafter liquidated and dissolved in accordance with the plan of reorganization.

### FINDINGS OF FACT.

Most of the facts are stipulated. Those facts and the pertinent exhibits are found as stipulated and are incorporated herein by reference.

The petitioner, Dumont-Airplane & Marine Instruments, Inc. (hereinafter referred to as Dumont), is a corporation which maintains an office in New York, New York. It filed its tax returns for the years 1951, 1952, and 1953, with the collector of internal revenue for the second district of New York.

Dumont was incorporated in September 1937, under the laws of the State of New York, to engage in the manufacture and sale of electronic communication equipment.

*Basis—Clearfield Plant.*

In 1926 the American Mond Nickel Company (hereinafter referred to as American Mond) acquired a plant consisting of buildings and land (hereinafter referred to as the Clearfield Plant) in Clearfield, Pennsylvania. In 1929 American Mond became a wholly owned subsidiary of the International Nickel Corporation (hereinafter referred to as International Nickel) and the operation of the Clearfield Plant by American Mond was no longer necessary.

Sometime prior to 1936 a group of Clearfield citizens organized the Clearfield Corporation under the laws of the State of Pennsylvania.

Pursuant to an agreement dated May 5, 1936, American Mond, on June 15, 1936, sold the Clearfield Plant to the Clearfield Corporation for $15,000. The sale of the Clearfield Plant was reported by American Mond on its tax return for 1936, as a sale of a capital asset resulting in a long-term capital loss of $234,701.59.

The Clearfield Corporation, shortly after the acquisition of the Clearfield Plant, placed it in the hands of the Chamber of Commerce of Clearfield for the purpose of securing a desirable occupant or purchaser.

On August 2, 1939, the Chamber of Commerce entered into an agreement with the Stemmler Engineering Company (hereinafter referred to as Stemmler), a partnership which owned a controlling interest in Dumont. The agreement provided, among other things, that the Chamber of Commerce would provide quarters suitable for the occupancy of Dumont (the Clearfield Plant) and that it would have the owner of the Clearfield Plant lease it to Dumont for a period of 5 years at $1,800 per year, with an option to purchase the plant at any time within the 5 years for $7,500 plus the cost of any improvements made to make the plant suitable to occupancy by Dumont. Stemmler agreed to have Dumont relocate its operations at Clearfield. On September 19, 1939, Stemmler deposited 33,000 shares of Dumont stock in escrow with the Clearfield Trust Company as evidence of its good faith to locate in Clearfield.

On September 22, 1939, the Clearfield Corporation leased the Clearfield Plant to Dumont under the terms of the agreement between Stemmler and the Chamber of Commerce. Thereafter, Dumont moved to and carried on its operations at the Clearfield Plant.

On December 31, 1942, Dumont exercised its option and purchased the Clearfield Plant from the Clearfield Corporation for a total price of $43,000.[1] Dumont allocated the purchase price of $43,000 on the basis of $4,000 for the land and $39,000 for the buildings. During the

---

[1] The indenture recited a consideration of $48,000. However, it was stipulated that the purchase price was $43,000.

years 1943 through 1946 Dumont claimed and was allowed deductions for depreciation on the Clearfield Plant buildings at the rate of 3 per cent of $39,000, or $1,170 per year.

During 1944 the Clearfield Trust Company released all of Dumont's stock which it had held in escrow since September 19, 1939.

In 1947 Dumont revalued its Clearfield Plant buildings and added $592,954.30 to its original cost basis of $39,000. However, Dumont still claimed depreciation on the buildings on its original cost basis of $39,000 and continued to do so through the year 1950.

In 1951 Dumont again revalued its buildings as a result of an appraisal, and increased the value of its Clearfield Plant buildings to $1,065,067.40.

In 1951 Dumont also obtained an appraisal, by an appraisal company, of the value of its Clearfield Plant buildings as of December 31, 1942, of $353,504.75. Such appraisal was made on the basis of replacement cost less physical wear and tear as of December 31, 1942. The cost of replacement was computed at prices prevailing in 1942, less an estimate of physical wear and tear, based on an assumption, in 1951, of what the physical condition of the property would have been in 1942, expressed as a percentage of such replacement cost.

On its income tax returns for 1951, 1952, and 1953, Dumont claimed deductions for depreciation on its Clearfield Plant buildings at the rate of 3 per cent of $353,504.75, or $10,605.14 per year.

On its excess profits tax returns for 1951 and 1952, Dumont used the above-mentioned revaluations of the Clearfield Plant as its adjusted basis in computing its excess profits credit based on invested capital.

The Commissioner determined that Dumont's adjusted basis in the Clearfield Plant buildings for the purposes of computing its depreciation and its excess profits credit was Dumont's cost of $39,000. Depreciation allowable, as computed by the Commissioner, was 3 per cent of $39,000, or $1,170 per year.

### Unused Excess Profits Credit Adjustment.

On or about March 24, 1953, Dumont acquired substantially all of the assets, subject to the liabilities, of Dumont Electric Corporation (hereinafter referred to as Dumont Electric), solely in exchange for part of the voting stock of Dumont pursuant to a plan of reorganization which qualified as a tax-free exchange to Dumont.

Dumont Electric had been in existence and carried on active business operations from the taxable year 1946 up to the date of the reorganization in 1953. Immediately after the reorganization in accordance with the plan of reorganization Dumont Electric was liquidated and dissolved.

1312

Dumont computed unused excess profits credits for Dumont Electric on the basis of figures contained in tax returns filed by that corporation, as follows: .

| Year | Unused excess profits credits |
|---|---|
| 1950 | $2,751.57 |
| 1951 | 97,395.15 |
| 1952 | 214,369.24 |
| 1953 | 129,567.13 |
| Total | 444,083.09 |

Dumont combined the foregoing unused excess profits credits of $444,083.09 with an unused excess profits credit it computed for itself for 1953, and filed an application for a tentative carryback adjustment, claiming a refund of excess profits tax in the amount of $40,-956.14 for 1952 on the basis of a total unused excess profits credit adjustment to such year of $525,831.28. Such amount was refunded to Dumont on June 15, 1954.

The Commissioner determined that Dumont's excess profits credit for 1953 was $145,434.81, and he subtracted therefrom Dumont's excess profits net income as adjusted of $71,523.77, thereby determining that the sum allowable to Dumont as an unused excess profits credit carryback from 1953 to 1952 was only $73,911.04. Accordingly, part of the deficiency in taxes for 1952 resulted from the Commissioner's disallowance of an unused excess profits credit adjustment in excess of $73,911.04.

OPINION.

*Basis—Clearfield Plant.*

In 1951, Dumont increased its basis in the Clearfield Plant buildings from $39,000 to $353,504.75, and on its income tax returns for 1951, 1952, and 1953 used that increased basis in computing depreciation. In arguing that this action was proper, reliance is placed on *Brown Shoe Co.* v. *Commissioner*, 339 U. S. 583 (1950).

In the *Brown Shoe* case the taxpayer had received cash or buildings from various community groups in towns in which it conducted manufacturing operations. These were given under contracts, and were designed to induce the taxpayer to locate or remain and expand its factory operations in the towns and to provide employment there. The Court held that the assets transferred to the taxpayer by the community groups represented "contributions to capital." Accordingly, the taxpayer was entitled to deduct depreciation on the buildings received as well as on the full cost of property acquired with the contributed cash. It was also decided that the taxpayer was entitled to use such assets in computing its invested capital.

Dumont contends that it falls within the rationale of the *Brown Shoe* case. Its contention is that the amount paid to the Clearfield Corporation for the Clearfield Plant and the amount which the Clearfield Corporation paid to American Mond to secure that property did not impair the basic nature of the transactions as gifts and/or contributions to capital of the recipients, since the amounts so paid were nominal. Therefore, under section 113 (a) (2),[2] or section 113 (a) (8) (B),[3] of the Internal Revenue Code of 1939, Dumont's basis in the Clearfield Plant would be American Mond's adjusted basis in 1936 plus the cost of improvements made thereon by the Clearfield Corporation.

To support its proposition Dumont contrasts the alleged value of the Clearfield Plant with the amounts for which it was sold. Thus, American Mond's basis in the property was $249,701.59, yet that corporation sold it for $15,000. And the petitioner also points out that while the alleged replacement cost of the property at the end of 1942 was $353,504.75, yet the Clearfield Corporation sold it at that time to Dumont for but $43,000. Dumont argues that it is apparent from the discrepancies in the above figures that the value of the Clearfield Plant at the time of its transfer to the Clearfield Corporation and the later transfer to Dumont was so much greater than the sums received therefor by American Mond and the Clearfield Corporation, that the transfers could only have been intended as gifts or contributions to capital.

The Commissioner contends that Dumont failed to prove that the separate transfers of the Clearfield Plant, first, by American Mond to the Clearfield Corporation, and, second, by the Clearfield Corporation to Dumont, were to any extent gifts within the meaning of section 113 (a) (2), or contributions to capital within the meaning of section 113 (a) (8) (B).

The Commissioner's further argument is that Dumont has failed to establish that the fair market value of the Clearfield Plant was in excess of the sale price at the time of either transfer. Therefore, under the principles of *Detroit Edison Co.* v. *Commissioner*, 319 U. S.

---

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

* * * * * * *

(2) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, * * *

[3] SEC. 113 (a) (8). PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.— If the property was acquired after December 31, 1920, by a corporation—

* * * * * * *

(B) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

98 (1943), the only depreciable basis which Dumont has in the Clearfield Plant is $39,000 which is that part of the $43,000 purchase price allocated to the buildings. The Commissioner cites *Las Vegas Land & Water Co.*, 26 T. C. 881 (1956), as being directly in point.

We think that the Commissioner's determination must be sustained on the record.

There is no credible evidence to show that American Mond intended to make a gift or contribution to capital to the Clearfield Corporation in 1936 when it sold the plant to the latter corporation for $15,000. Dumont's argument that the plant must have been worth more than the $15,000 sale price, because American Mond's adjusted basis in that property was $249,701.59, is without merit. A taxpayer's basis in property, standing alone, does not establish the fair market value of the property. Especially is this true in a time of extraordinary economic circumstances, such as a severe depression. On the record, American Mond sold the plant for a substantial monetary consideration. We find no evidence that American Mond intended to make a gift or contribution of capital to the Clearfield Corporation, and the principles of the *Brown Shoe* case are not applicable here. Furthermore, American Mond reported a long-term capital loss in the amount of $234,701.59 as a result of the sale, and, even assuming that American Mond intended to make a contribution to the Clearfield Corporation's capital, under the unambiguous terms of section 113 (a) (8) (B), the latter corporation's basis in the Clearfield Plant would only be $15,000, which is "the basis * * * in the hands of the transferor, * * * decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

The Clearfield Corporation's desire to have Dumont settle in Clearfield and its sale of the Clearfield Plant to Dumont at its approximate cost in some circumstances might be evidence that it intended to make a contribution to Dumont's capital as contended by Dumont. However, Dumont has failed to show that the Clearfield Corporation intended to or actually did make a contribution to Dumont's capital. Dumont's argument that the Clearfield Corporation must have made a gift or capital contribution to Dumont at December 31, 1942, when it sold the Clearfield Plant for $43,000, at which time it is claimed the plant had a replacement cost of $353,504.75, is fallacious. The argument ignores the fact that the Clearfield Corporation bound itself in the lease agreement executed on September 22, 1939, to sell for the amount paid by Dumont at any time during the term of the lease. Nor has Dumont made any showing as to what the fair market value of the Clearfield Plant was at that date. It is entirely possible

and it has not been proved otherwise that the fair market value of the plant at the date of the lease did not exceed the option price, in which case there could be no gift or contribution to capital from the Clearfield Corporation to Dumont. We hold that Dumont has failed to show that the Clearfield Corporation made a gift or contribution to capital to Dumont when the Clearfield Plant was sold to Dumont on December 31, 1942. The facts of this case bring it much closer to *Las Vegas Land & Water Co.*, *supra*, than to *Brown Shoe* and we think the former case is controlling here. In the *Las Vegas* case we note that the taxpayer's basis was limited to the monetary consideration which amounted to a mere $2.

Accordingly, it was proper for the Commissioner to use Dumont's cost basis of $39,000 in computing Dumont's depreciation on the Clearfield Plant, *Detroit Edison Co.* v. *Commissioner*, *supra*, and in computing Dumont's excess profits credit, section 437 (c), I. R. C. 1939.[4]

### *Unused Excess Profits Credit Adjustment.*

On this issue, Dumont contends that in computing its correct excess profits tax liability for 1952, it is entitled to carry back the unused excess profits credit of Dumont Electric, a corporation that dissolved immediately after transferring its assets, subject to liabilities, to Dumont in 1953 in exchange for certain shares of the latter corporation's stock, in a tax-free reorganization. The Commissioner, on the other hand, contends that Dumont is not so entitled, because Dumont is not the "taxpayer" within the meaning of section 432 (c) (1). That section provides that—

If for any taxable year beginning after July 1, 1950, the *taxpayer* has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for the preceding taxable year. [Emphasis supplied.]

Dumont relies primarily upon *Stanton Brewery* v. *Commissioner*, 176 F. 2d 573 (C. A. 2, 1949), reversing 11 T. C. 310 (1948); *E. & J. Gallo Winery* v. *Commissioner*, 227 F. 2d 699 (C. A. 9, 1955), reversing a Memorandum Opinion of this Court dated April 17, 1953; and *Koppers Company* v. *United States*, 134 F. Supp. 290 (Ct. Cl., 1955), to sustain its position.

In the *Stanton* and *Gallo Winery* cases in the Courts of Appeals, it was held that a corporation formed by a statutory merger was en-

---

[4] SEC. 437. INVESTED CAPITAL CREDIT.

(c) DEFINITION OF EQUITY CAPITAL.—The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time. For such purposes, the amount attributable to each asset shall be determined by ascertaining the adjusted basis thereof * * * and the adjusted basis shall be the adjusted basis for determining gain upon sale or exchange. * * *

titled to carry over from a period prior to the merger, the unused excess profits credit of its component corporations, under section 710 (c) (3) (B). In the *Koppers* case it was held that the unused excess profits credit of a corporation formed by a statutory merger could be carried back against the excess profits of its component corporations, under section 710 (c) (3) (A).

If we sustain Dumont on this issue, the result will be that Dumont's excess profits for 1952 will be reduced by the unused excess profits credit of Dumont Electric, a corporation which was completely unrelated to Dumont in 1952. Section 432 (c) (1) does not justify such a holding. The statutes pertaining to the determination of taxable income have disclosed a general purpose to confine allowable losses to the taxpayer sustaining them, that is, to treat them as personal to the taxpayer and not transferable to or usable by another. *New Colonial Co.* v. *Helvering*, 292 U. S. 435 (1934). We think the natural import of the words of section 432 (c) (1) is that only the taxpayer which accumulated the unused excess profits credit may carry it back and offset it against its prior excess profits. We therefore sustain the Commissioner's determination. See *Old National Bank in Evansville*, 28 T. C. 1075.

Our holding is on all fours with the theory of *Libson Shops, Inc.* v. *Koehler*, 353 U. S. 382 (1957). In that case it was held that a corporation resulting from a merger of 16 separate incorporated businesses, which had filed separate income tax returns, may not carry over and deduct the pre-merger net operating losses of three of its constituent corporations from the post-merger income attributable to the other businesses. The Supreme Court reasoned that the taxpayer was not entitled to a carryover since the income against which the offset was claimed was not produced by substantially the same business which incurred the losses.

See also, *Gramm Trailer Corporation*, 26 T. C. 689 (1956), appeal to C. A. 6 dismissed pursuant to stipulation, and *Patten Fine Papers, Inc.*, 27 T. C. 772 (1957), on appeal (C. A. 7), where we respectively held that a parent corporation could not carry over and deduct from its gross income or its net capital gain, the net operating loss or net capital loss of its liquidated subsidiary, since the parents were not the "taxpayers" who sustained the losses involved, within the meaning of sections 122 (b) (2) (C) and 117 (e) (1).

*Decisions will be entered for the respondent.*