**FIDELITY–BALTIMORE NATIONAL BANK, a body corporate, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 11493.

United States District Court
D. Maryland.

Feb. 6, 1963.

George D. Hubbard, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Bernard J. Schoenberg, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., Attys., Dept. of Justice, Washington, D. C., and Joseph D. Tydings, U. S. Atty., Baltimore, Md.), on the brief, for defendant.

WINTER, District Judge.

As an incident to the corporate marriage of Baltimore National Bank, a national banking association (hereafter called "Baltimore"), and The Fidelity Trust Company, a Maryland chartered state bank (hereafter called "Fidelity"), the Commissioner of Internal Revenue determined that the resulting Fidelity-Baltimore National Bank & Trust Company (hereafter called "Fidelity-Baltimore"), was liable for original issue and documentary stamp tax for shares of Fidelity-Baltimore issued to shareholders of Baltimore and Fidelity. Fidelity-Baltimore paid the taxes, filed timely claims for refund, and, when these were disallowed, instituted this action.

FACTS:

Prior to July 16, 1954, Baltimore had issued and outstanding 125,000 shares of common stock, having a par value of $10.00 per share, a total capitalization of $1,250,000.00, and Fidelity had issued and outstanding 97,600 shares of common stock, having a par value of $25.00 per share, a total capitalization of $2,440,000.00.

By agreement dated April 30, 1954, subject to the approval of the stockholders of both institutions and the Comptroller of the Currency (all of which approvals were forthcoming, so that the agreement became effective on July 16, 1954), Balti-

more and Fidelity agreed that they should be "consolidated under the charter of Baltimore National Bank," the name of the consolidated association to be known as Fidelity-Baltimore National Bank & Trust Company. The capital structure of Fidelity-Baltimore was established in the aggregate amount of not less than $14,111,806.00, consisting of capital stock of $3,000,000.00, divided into 300,000 shares of the par value of $10.00 each, surplus of $10,000,000.00, and undivided profits of not less than $1,111,806.00.

After providing for the contribution of Baltimore and Fidelity to Fidelity-Baltimore, which in the case of Fidelity required it, *inter alia*, to transfer its portfolio of securities, the agreement specified that the 300,000 shares of $10.00 common stock of Fidelity-Baltimore should be distributed as follows: The shareholders of Baltimore received in exchange for their old shares 143,750 shares of new common stock. Thus, for each share of old $10.00 common stock, 1.15 shares of the new $10.00 common stock was issued and distributed. The shareholders of Fidelity received in exchange for their Fidelity shares 156,160 shares of new common stock. Thus, for each share of the $25.00 par value common stock of Fidelity, 1.6 shares of the new $10.00 par value common stock was issued and distributed. Distribution to shareholders of Fidelity was made directly in exchange for their old Fidelity stock. In this fashion, 299,910 shares of the 300,000 shares of new common stock were allocated and distributed. The balance of 90 shares was sold to the public.

Fidelity-Baltimore voluntarily paid documentary stamp tax on these 90 shares. The Commissioner determined that Fidelity-Baltimore owed additional tax as follows:

Amount of Tax

(a) Original issue tax based on the par value of the 156,160 shares issued to shareholders of Fidelity;   $1,833.26

(b) Original issue tax on the 143,750 shares, to the extent they represented newly dedicated capital, issued to shareholders of Baltimore; [1]   208.29

(c) Transfer tax based on the transfer by Fidelity to its old shareholders of its right to receive 156,160 shares of Fidelity-Baltimore; and   802.30

(d) Transfer tax on securities in Fidelity portfolio   862.35

Total........$3,706.20

Additionally, the Commissioner assessed interest in the amount of $903.50, so that the total paid by Fidelity-Baltimore, and sought to be recovered in this action, is $4,609.70, with interest at the rate of 6% per annum from August 15, 1958.

DISCUSSION AND OPINION:

The taxes asserted by the Commissioner were prescribed by the Internal Revenue Act of 1939, as amended, in effect on July 16, 1954, because the transactions allegedly giving rise to liability for the taxes were all concluded before the effective date of the Internal Revenue Act of 1954, which was January 1, 1955. Section 1800 of the Internal Revenue Act of 1939, 26 U.S.C. (Internal Revenue Code, 1939, as amended), § 1800, provides that "There shall be levied, collected, and paid * * * the several taxes specified

---

[1]. The amount of original issue tax on stock issued to shareholders of Baltimore was based on the following recapitalization formula:

| | | |
|---|---|---|
| Capitalization under new issue | 143,750 shares at $10 per share = | $ 1,437,500 |
| Capitalization under old issue | 125,000 shares at $10 per share = | 1,250,000 |
| Difference representing amount transferred to capital account for first time | | $    187,500 |

\* \* \*" in §§ 1800 to 1807, inclusive. Thus included is § 1802, which deals with capital stock and similar interests, and its pertinent provisions are set forth below.[2]

It seems clear that, except for the fact that Baltimore (and, as it was subsequently known, Fidelity-Baltimore) is a national banking association, the significance of which is hereafter discussed, the taxes levied and collected by the Commissioner were properly levied and collected, and taxpayer would be entitled to no refund. The application of the taxes to the transaction previously described, if both of the participating corporations were ordinary business corporations chartered under state law, is readily apparent from brief reference to the Treasury Regulations in force and effect on January 1, 1954 relative to documentary stamp taxes, and the statute itself. Section 113.24 of those Regulations states, with regard to the original issue tax:

"The following are examples of issues subject to the taxes:

"(g) Stock issued by a consolidated corporation in exchange for stock of the consolidating corporation.

"(h) Stock issued in connection with a merger by the continuing corporation to the stockholders of the merging corporation; and, under certain circumstances, stock issued to the stockholders of the continuing corporation."[3]

2. "§ 1802. Capital stock (and similar interests)

"(a) *Original issue.* On each original issue, whether on organization or reorganization, of shares or certificates of stock, or of profits, or of interests in property or accumulations, by any corporation, or by any investment trust or similar organization (or by any person on behalf of such investment trust or similar organization) holding or dealing in any of the instruments mentioned or described in this subsection or section 1801 (whether or not such investment trust or similar organization constitutes a corporation within the meaning of this title), on each $100 of par or face value or fraction thereof of the certificates issued by such corporation or by such investment trust or similar organization \* \* \*, 11 cents: \* \* \* *Provided further,* That where such certificates (or shares, where no certificates are issued) are issued in a recapitalization, the tax payable shall be that proportion of the tax computed on such certificates or shares issued in the recapitalization that the amount dedicated as capital for the first time by the recapitalization, whether by a transfer of earned surplus or otherwise, bears to the total par value (or actual value if no par stock) of such certificates or shares issued in the recapitalization. The stamps representing the tax imposed by this subsection shall be attached to the stock books or corresponding records of the organization and not to the certificates issued.

"(b) *Sales and transfers.* On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the shares or certificates mentioned or described in subsection (a), or to rights to subscribe for or to receive such shares or certificates, whether made upon or shown by the books of the corporation or other organization, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of such share, certificate, interests, or rights, or not), on each $100 of par or face value or fraction thereof of the certificates of such corporation or other organization (or of the shares where no certificates were issued) 5 cents and where such shares or certificates are without par or face value, the tax shall be 5 cents on the transfer or sale or agreement to sell on each share (corporate share, or investment trust or other organization share, as the case may be):

\*          \*          \*          \*          \*

"(c) *Transfers by operation of law.* No delivery or transfer under subsection (b) not otherwise exempt shall be exempt because effected by operation of law. \* \* \*"

3. Section 113.23(e) (2) treats with the application of the tax to stock issued to stockholders of a continuing corporation. Summarized, the section requires that the tax be paid when, as a result of the merger, the continuing corporation transfers capital surplus to capital and issues stock therefor to its stockholders. Viewed from the standpoint of Baltimore's stockholders, this is precisely what was done.

Insofar as the transfer tax is concerned, § 113.33 renders the following transactions, whether effected by means of certificates, or other instruments, or by entries on the books of the issuing corporation, or other entity, or otherwise, taxable:

"(h) Transfer upon a merger from the name of a merging corporation of stock owned by it to the name of the continuing corporation, since such a transfer arises by action of the parties and not wholly by operation of law. Similarly, upon a consolidation, a transfer from any of the consolidating corporations to the new or consolidated corporation." [4]

Thus, § 1802(a) of the Act taxes original issues of stock whether or not made in connection with a reorganization or recapitalization, and § 113.24(g) and (h) of the Regulations specifically state that stock issued to the stockholders of a consolidating corporation in connection with a consolidation, and stock issued to the stockholders of the merging corporation, in connection with a merger, are subject to the original issue tax. If Baltimore and Fidelity were ordinary business corporations, there could be no question but that the stock of Fidelity-Baltimore issued to stockholders of Baltimore, at least to the extent that it represented a dedication of new capital, was subject to the original issue tax, and the stock issued to stockholders of Fidelity was also subject to the original issue tax, since Fidelity either merged into or consolidated with Baltimore. The stock of Fidelity-Baltimore issued to stockholders of Fidelity would also be subject to the transfer tax by virtue of the provisions of § 1802 (b) and § 113.33(i) of the Regulations, because Fidelity would have the right to receive, as consideration for the transfer of its assets to Fidelity-Baltimore, 156,-160 shares of Fidelity-Baltimore stock, and if the latter were then transferred by Fidelity to its shareholders a transfer tax would be due. Although the Fidelity-Baltimore stock went directly to Fidelity's stockholders, the legal effect, for purposes of taxation, is the same, Raybestos-Manhattan Co. v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44 (1935); United States Industrial Chemicals, Inc. v. Johnson, 181 F.2d 413 (2 Cir., 1950); and American Processing & Sales Co. v. Campbell, 164 F.2d 918 (7 Cir., 1947). Also without question would be the application of the tax to the transfer by Fidelity of its portfolio of securities by virtue of the provisions of § 1802(b) of the statute and § 113.33 (h) of the Regulations, when read in conjunction with § 1802(c) of the statute, which was enacted to overcome the result in United States v. Seattle-First Nat. Bank, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944).

But the taxpayer urges most strongly that the rules applicable to ordinary business corporations are inapplicable to it, since Baltimore and Fidelity-Baltimore are national banking associations, and the corporate marriage between Baltimore and Fidelity was solemnized under the provisions of § 34a of the National Banking Act, previously codified as 12 U.S.C.A. § 34a, and now codified, in amended form, as 12 U.S.C.A. § 215a. Insofar as pertinent, that section, after authorizing a bank incorporated under state law to consolidate with a national bank, and providing the mechanics whereby that result may be obtained, provides:

" * * * Upon such a consolidation, or upon a consolidation of two or more national banking associations under section 33 of this title, *the corporate existence of each of the constituent banks and national banking associations participating in such consolidation shall be*

---

4. In this connection, § 113.34(h) and (i) renders *not* subject to the transfer tax, in the case of a consolidation, the surrender of stock of any of the consolidating corporations in exchange for stock of the new or consolidated corporation, and, in the case of merger, the surrender of stock of both the merging and continuing corporations in exchange for stock of the continuing corporation.

*merged into and continued in the consolidated national banking association and the consolidated association shall be deemed to be the same corporation as each of the constituent institutions."* (Emphasis supplied)

Based upon § 34a of the National Banking Act, and particularly the quoted italicized language, supra, Fidelity-Baltimore stresses the identity between it and its constituent parts. This argument is pressed as being applicable to the issuance and distribution of shares of Fidelity-Baltimore to the stockholders of Baltimore and Fidelity, so that the original issue tax does not apply,[5] nor the transfer tax to shares of Fidelity-Baltimore issued to stockholders of Fidelity. Fidelity-Baltimore argues that no securities owned by Fidelity were transferred to it, because Fidelity continued as part of the consolidated association.

The emphasized portion of § 34a of the National Banking Act was originally enacted as part of the amendment to the National Banking Act of June 16, 1933, 48 Stat. 190. The legislative history of this portion of the amendment was considered in Seattle-First National Bank v. United States, 44 F.Supp. 603 (D.C.E. D.Wash.1942), aff'd sub nom. United States v. Seattle-First National Bank, 136 F.2d 676 (9 Cir., 1943); 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944), and it was there concluded that the purpose of the amendment was (44 F.Supp. p. 610), " * * * to speed up state and national consolidations," because " * * * even the tragedy of the bank collapse and the hardships of the bank holiday had not resulted in a sufficient attitude of cooperation upon the part of the state banks for strengthening the banking structure of the country by means of consolidation with stronger national banks." As typical of state discouragement of state and national bank consolidations, see, Ex parte Worcester Nat. Bank, 279 U.S. 347, 49 S.Ct. 368, 73 L.Ed. 733 (1929), where, in the absence of the quoted language, a state determination that a national bank with which a state-chartered bank had been consolidated did not succeed to an executorship previously held by the state-chartered bank without a new appointment from the state probate court, was upheld; but, compare New England M. Nat. Bank v. Centenary Methodist Ch., 342 Mass. 360, 173 N.E.2d 294 (1961), decided after the amendment, in which a national bank with which a state-chartered bank had consolidated was permitted to continue as trustee of a trust, of which the state-chartered bank had been named trustee.

In accord with the latter, in this Circuit, Cannon v. Dixon, 115 F.2d 913 (4 Cir., 1940), held that the exchange of stock of a consolidated national bank for stock of a state-chartered bank held by a trustee did not constitute a change of investment illegal under state law. This result was reached partially in reliance upon the quoted language, and would seem to be well within the original intention of Congress in adopting the amendment.

Given its literal meaning, § 34a, while perhaps delving into the metaphysical (Cf. Koppers Coal & Transportation Co. v. United States, 107 F.2d 706 (3 Cir., 1939)), clearly creates a type of corporate union, separate and distinct from classical concepts of merger and consolidation, United States v. Northwestern Nat. Bank & T. Co. of Minneapolis, 137 F.2d 761, 763 (8 Cir., 1943); Fletcher, Cyclopedia of Corporations (1961 Ed.), Vol. 15, §§ 7075, 7197–7199, because both of the original entities continues in existence in contemplation of law, if not in fact. The Government's argument that the union of Baltimore and Fidelity was either a merger or a consolidation, and that tax treatment provided in the above quoted Regulations, applicable to either mergers or consolidations necessarily follows, cannot be supported.

5. To accomplish this result, Fidelity-Baltimore compares its aggregate issued capital to the aggregate issued capital of Baltimore and Fidelity.

Notwithstanding its original limited purpose to supersede state legislation, which had the practical effect of discouraging the consolidation of state-chartered banks with national banks, the emphasized language of § 34a has been given wider application. Of great significance to the case at bar are the holdings where the emphasized language of § 34a has been literally applied to give effect to the construction and application of federal tax statutes. In United States v. Northwestern Nat. Bank & T. Co. of Minneapolis, supra, the problem presented was one of the application of capital stock taxes where a state bank and a national bank consolidated under the charter of the national bank. The taxes were paid initially on the value of the assets of the consolidated association contributed by the state bank, but a refund of taxes was permitted on the theory that, by virtue of the quoted language, the consolidated association was deemed the same as each of its constituents and, therefore, no property was received by the consolidated association that was not owned before the union.[6]

Old Nat. Bank in Evansville v. Commissioner of Int. Rev., 256 F.2d 639 (7 Cir., 1958), concerned excess profits taxes and presented the problem of whether the unused excess profits tax credit of a state bank, which had been consolidated with a national bank, could be used by the consolidated association. A Tax Court determination denying use of the credit, on the ground that the consolidated association was not the same business as that carried on by the state bank, was reversed on appeal, because of § 34a of the National Banking Act, which stated that the state-chartered bank was continued in the consolidated association, and the consolidated association shall be deemed to be the same corporation as the state bank.

In an effort to avoid the persuasiveness of these authorities, which, while not dealing with the precise taxes in question here, generally stand for the proposition that the quoted language should be literally applied to brush aside logical distinctions between mergers and consolidations ordinarily drawn by state and federal law, and whether, factually, a consolidating or merging entity continues to exist and whether a new entity results, the Government cites United States v. Seattle Bank, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944), as a case which, not explicitly but necessarily, decided that Fidelity and Fidelity-Baltimore must be treated as two separate entities, in spite of the emphasized language of § 34a.

This case arose from a merger of a state and national bank under § 34a of the National Banking Act. The state bank owned a portfolio of securities in its own right, which were transferred to the national bank as a part of the corporate union. Insofar as pertinent here, the issue in the case was the correctness of the assessment of the transfer tax under § 800 of the Revenue Act of 1926 which, with one exception, was the same as 26 U.S.C.A. § 1802 under consideration here. The Supreme Court held the tax inapplicable on the ground that the transfer of the state bank's assets to the national bank took place by operation of law, the predecessor statute of § 1802 not then containing the specific language of § 1802 (c), rendering immaterial whether the transfer took place by operation of law or not.

It is urged that the significance of the case lies in the fact that the Supreme Court decided the case on the issue of

6. 137 F.2d 761, 763:
"Taxation can be imposed here only if property or cash was paid in for shares, or was received so as to constitute paid-in surplus or contributions to capital. Sec. 701(f), Revenue Act 1934. Since by the very language of the statute, the consolidated association must be deemed to be the same corporation as each of the constituents, it necessarily follows that nothing could be received in the form of property that it did not have before the union. The effect of the merger or consolidation depends upon the statute authorizing it. Cannon v. Dixon, 4 Cir., 115 F.2d 913; Pennsylvania Co. v. Commissioner, 3 Cir., 75 F.2d 719; Keokuk & W. R. Co. v. State of Missouri, 152 U.S. 301, 14 S.Ct. 592, 38 L.Ed. 450."

exemption by operation of law, because it is claimed the exemption issue would not have been reached if literal meaning were given to the language of § 34a, added by the 1933 Amendment. Hence, it is argued that Seattle Bank constitutes an adjudication adverse to the contentions of Fidelity-Baltimore.

Unquestionably, it is true that if literal meaning were given to the language of § 34a the actual issue passed upon need not have been considered. An examination of the successive adjudications in the case discloses that the District Court decided the case on both grounds (44 F. Supp. 603, 609–610), as did the Court of Appeals for the Ninth Circuit (136 F.2d 676). The lack of mention by the Supreme Court of the point that § 34a would render the transaction exempt is not of great significance, because the Supreme Court took jurisdiction of the case to settle an apparent conflict between the circuits on whether transfers by operation of law were within the scope of the predecessor statute to § 1802. The conflict arose from the decisions of the Ninth Circuit in the Seattle Bank case and United States v. Merchants Nat. Trust & Savings Bank, 101 F.2d 399 (9 Cir., 1939), the Second Circuit in City Bank Farmers Trust Co. v. Hoey, 125 F.2d 577 (2 Cir., 1942), and the First Circuit in State Street Trust Co. v. Hassett, 134 F.2d 156 (1 Cir., 1943). Of these, the latter two cases involved only state-chartered banks, and arose when securities held as trustee or custodian, were reregistered following corporate union. True, the Seattle Bank case might have been decided as the Government urges it should be construed, but such a decision would be foreign to the reason why the writ of certiorari was issued. Because of this reason, I do not consider that the Seattle Bank case even impliedly passed upon the effect of § 34a of the National Banking Act, and is not authority decisive of the issues here.

Nor is First Trust Co. of St. Paul v. United States, 15 F.Supp. 634 (D.C.Minn. 1936), authority contrary to the taxpayer's position here. That case rejected as binding upon federal taxing authorities the language of a state statute, as construed by a state court, under which two state-chartered banks were joined, in upholding the application of the capital stock tax to the consolidated corporation. The result was reached upon the basic principle that federal tax statutes are to be construed by federal law, and the determination of a state court in regard to a state statute deeming the consolidated corporation as a continuation of the corporate existence of the consolidating corporations, but, falling short of a direct statement such as found in § 34a that they shall be deemed the same, was not binding on the federal tax authorities.

When literal application is made of the language in § 34a, it necessarily follows that in most part Fidelity-Baltimore's contentions are correct and not all of the taxes assessed by the Commissioner can be upheld. When Fidelity-Baltimore is deemed the same as Fidelity, it necessarily follows that a transfer tax may not be imposed on the transfer of Fidelity's portfolio of securities, or on the transfer to Fidelity's stockholders of Fidelity's right to receive stock of Fidelity-Baltimore, because there has been no change of ownership from one separate entity to another separate entity.

When Fidelity-Baltimore is deemed the same as Fidelity, original issuance taxes apply only to the extent that the exchange of $25.00 par value stock for $10.00 par value stock resulted in a dedication of additional capital. Since Fidelity's initial capitalization was $2,440,000.00, consisting of 97,600 shares of $25.00 par value stock, and since there was substituted therefor 156,160 shares of $10.00 par common stock, having an aggregate par value of $1,561,600.00, there was no dedication of new capital and, hence, no tax is payable.

When Fidelity-Baltimore is treated the same as Baltimore, 143,750 shares of $10.00 par value stock, having an aggregate par value of $1,437,500.00, was exchanged for 125,000 shares of $10.00 par value common stock, for a total par value of $1,250,000.00, so there is the dedica-

tion of new capital, in the aggregate amount of $187,500.00, on which the original insuance tax does apply.

Judgment will be entered for Fidelity-Baltimore for a refund of all taxes paid, except the original issue tax on the new capital of Fidelity-Baltimore, in the aggregate amount of $187,500.00. Counsel may compute the amount of refund due Fidelity-Baltimore and prepare an appropriate judgment.