Mary Archer W. Morris Trust, North Carolina National Bank, Trustee, Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 623–63.    Filed July 24, 1964.

*Richard E. Thigpen* and *Robert L. Hines*, for the petitioner.
*Wallace E. Whitmore*, for the respondent.

Bruce, *Judge:* The respondent determined a deficiency in income tax of the trust in the amount of $413.44 for the calendar year 1960. The sole issue for decision is whether the value of certain stock distributed to the trust was taxable as a dividend. Some facts are stipulated.

FINDINGS OF FACT

The stipulated facts are found and the exhibits to the stipulation are incorporated by this reference.

The petitioner is a trust established under the will of James N. Williamson, Jr., who died May 17, 1945. The North Carolina National Bank, of Charlotte, N.C., herein referred to for convenience as NCNB, is the successor trustee of the trust. The fiduciary income tax return of the trust for the calendar year 1960 was filed with the district director of internal revenue at Greensboro, N.C.

Under acts of the General Assembly of North Carolina, the Southern States Trust Co. was organized in 1901 and its name was changed to American Trust Co. in 1907. In 1957 this corporation and the Commercial National Bank of Charlotte merged to form the American Commercial Bank, hereinafter referred to as American, which operated as a banking corporation under the State laws. Under the original charter and the State laws American Trust Co. and its successor conducted a general insurance business as a separate department of the bank for more than 50 years prior to 1960. Neither the banking business nor the insurance business of American had been acquired within the 5-year period ending on June 30, 1960, in a transaction in which gain or loss was recognized in whole or in part.

In the early part of 1960 negotiations were carried on between representatives of American, and Security National Bank of Greensboro, hereinafter referred to as Security, looking toward a consolidation of the two banks. An agreement of consolidation was signed by representatives of both banks on April 27, 1960. The agreement was subject to ratification by the stockholders and to be effective at the time specified in a certificate of the Comptroller of the Currency approving the consolidation.

The agreement provided in part:

This AGREEMENT made between Security National Bank of Greensboro (hereinafter referred to as "Security"), a banking association organized under the laws of the United States, being located at Greensboro, County of Guilford, in the State of North Carolina, with a Capital of $3,875,000, divided into 775,000 shares of common stock, each of $5.00 par value, Surplus of $10,625,000 and Undivided Profits, including Capital Reserves, of $2,045,356, as of April 8, 1960, and American Commercial Bank (hereinafter referred to as "American"), a banking corporation organized under the laws of the State of North Carolina, being located at Charlotte, County of Mecklenburg, in the State of North Carolina, with a Capital of $4,200,000, divided into 420,000 shares of capital stock, each of $10.00 par value, Surplus of $14,800,000, and Undivided Profits of $2,367,363, as of April 8, 1960, each acting pursuant to a resolution of its Board of Directors, adopted by the vote of a majority of its directors, pursuant to the authority given by and in accordance with the provisions of the Act of November 7, 1918, as amended (12 U.S.C., Section 215), and the applicable provisions of Chapters 53 and 55 of the General Statutes of North Carolina, witnesseth as follows:

Section 1.

Security and American (hereinafter referred to as the "Consolidating Banks") shall be consolidated under the charter of Security.

\*        \*        \*        \*        \*        \*        \*

Section 4.

The amount of capital stock of the Association shall be $9,344,500, divided into 1,868,900 shares of common stock, each of $5.00 par value, and at the time the consolidation shall become effective, the Association shall have a Sur-

plus of $25,655,500, and Undivided Profits, including Capital Reserves, which when combined with the Capital and Surplus will be equal to the combined capital structures of the Consolidating Banks as stated in the preamble of this agreement, adjusted, however, for normal earnings and expenses between April 8, 1960 and the effective time of the consolidation.

## Section 5.

Except as hereinafter provided in Section 7 of this agreement, all assets of each of the Consolidating Banks, as they exist at the effective time of the consolidation, shall pass to and vest in the Association without any conveyance or other transfer; and the Association shall be responsible for all of the liabilities of every kind and description, including liabilities arising out of the operation of a Trust Department, of each of the Consolidating Banks existing as of the effective time of the consolidation.

\*     \*     \*     \*     \*     \*     \*

## Section 6.

Of the capital stock of the Association, the shareholders of Security shall be entitled to 852,500 shares, being one and one-tenth shares, each of $5.00 par value, for each share of $5.00 par value now held by them, being 45.615% of the total number of shares of capital stock of the Association; and the shareholders of American shall be entitled to 1,016,400 shares, being two and forty-two one hundredths shares, each of $5.00 par value, for each share of $10.00 par value now held by them, being 54.385% of the total number of shares of capital stock of the Association.

\*     \*     \*     \*     \*     \*     \*

## Section 7.

Until the consolidation shall have become effective, neither of the Consolidating Banks shall, without the written consent of the other authorized by resolution of a majority of its entire Board of Directors, authorize any change in its capital structure, or declare or pay any dividend or make any other distribution to shareholders, or dispose of any of its assets or enter into any contracts or agreements other than in the normal course of business and for adequate value; provided, however, that upon the consolidation becoming effective American shall forthwith divest itself of its insurance business and all of the assets and liabilities thereof as of the effective time of the consolidation (a) by assigning and transferring to a wholly-owned subsidiary corporation of American all of its right, title and interest in and to its Insurance Department and the books, records, fixtures, good will, accounts receivable and other assets of said Insurance Department, subject to the liabilities thereof, in exchange for 420,000 shares of its $1.00 par value common stock, which 420,000 shares shall thereupon be distributed by American to its shareholders as of the effective time of the consolidation on the basis of one share of such common stock for each share of $10.00 par value capital stock of American held as of the effective time of the consolidation, or (b) in such other manner for the benefit of the shareholders of American as shall be approved by its Board of Directors.

Each of the corporations which was a party to the agreement called a special meeting of the stockholders to consider the agreement, and the shareholders of each corporation approved it on May 26, 1960. The Comptroller of the Currency approved the consolidation to be effective at the close of business June 30, 1960.

American and Security were publicly owned corporations. On April 18, 1960, American had 1,571 shareholders. On April 21, 1960, Security had 1,325 shareholders. After the consolidation NCNB had 2,849 shareholders.

Pursuant to the agreement the banks were consolidated under the charter of Security, effective at the close of business on June 30, 1960. The consolidated bank, as NCNB, was opened for business on July 1, 1960.

Under 12 U.S.C. sec. 92, a national bank is not permitted to operate an insurance department except in a place where the population does not exceed 5,000 inhabitants. The populations of Charlotte and Greensboro each greatly exceeded this number.

The American Commercial Agency, Inc., hereinafter referred to as Insurance, was incorporated under the laws of the State of North Carolina on June 7, 1960, for the purpose of continuing the insurance business of American. On June 30, 1960, pursuant to the agreement of consolidation, American transferred the assets employed in its insurance department, subject to the liabilities thereof, to Insurance in exchange for 420,000 shares of the common stock of Insurance. On June 30, 1960, Insurance authorized and requested the corporate trust department of American to issue to American a certificate for the 420,000 shares of its common stock.

American distributed all of the 420,000 shares of stock of Insurance to "the shareholders of American Commercial Bank of record at 1 : 00 P.M." on June 30, 1960, "on a share for share basis in accordance with their respective holdings of the 420,000 shares of" American "outstanding at such time."

Immediately after American transferred its insurance department assets to Insurance, Insurance continued the insurance business which theretofore had been operated for more than 5 years as a department of American. Insurance is now and continues to be engaged in the general insurance business. The financial position of Insurance immediately after the transfer of the assets of the insurance department from American to it was as follows:

ASSETS

| | | | |
|---|---|---|---|
| CURRENT ASSETS: | | | |
| Cash in bank | | $31,430.11 | |
| Accounts receivable: | | | |
| Customers | $320,947.40 | | |
| Insurance companies | 20,214.57 | 341,161.97 | |
| | | | $372,592.08 |
| FURNITURE AND EQUIPMENT (at cost): | | | |
| Furniture | 3,843.20 | | |
| Office machinery | 3,487.50 | | |
| Automobile | 1,060.00 | | |
| | | | 8,390.70 |

DEFERRED CHARGES:

Goodwill—excess of market value of common capital stock over net assets received therefor _____ $516, 609. 30

Organization expense_____ 405. 00

Other_____ 1, 004. 16

$518, 018. 46

Total_____ 899, 001. 24

## LIABILITIES

CURRENT LIABILITIES—ACCOUNTS PAYABLE:

Insurance companies_____ 362, 971. 80

Customers_____ 9, 392. 49

Employee_____ 135. 90

Others_____ 1, 501. 05

374, 001. 24

STOCKHOLDERS' EQUITY:

Common capital stock—par value $1 (authorized, 1 million shares; issued and outstanding, 420,000 shares)_____ 420, 000. 00

Excess of market value of common capital stock at date of issue over par value thereof_____ 105, 000. 00

525, 000. 00

Total_____ 899, 001. 24

The fair market value of the common stock of Insurance on June 30, 1960, was $1.25 per share.

The following figures show the earnings of American and of its insurance department prior to the consolidation, and certain other data:

| AMERICAN: | 1958 | 1959 | 1960 (First 6 mos.) |
|---|---|---|---|
| Earnings after tax____ | $1, 541, 919. 00 | $1, 877, 150. 00 | $1, 372, 536. 00 |
| Dividends_____ | 840, 000. 00 | 945, 000. 00 | 472, 500. 00 |
| Dividends per share___ | 2. 00 | 2. 25 | 1. 105 |
| INSURANCE DEPARTMENT: | | | |
| Commissions_____ | 393, 643. 00 | 383, 097. 00 | 176, 633. 00 |
| Earnings after estimated share of tax__ | 72, 783. 00 | 69, 487. 00 | 27, 054. 00 |

On June 30, 1960, prior to the transfer of its insurance department assets, American had—

Outstanding capital stock of_____ $4, 200, 000. 00

Surplus of_____ 14, 800, 000. 00

and undivided profits of_____ 2, 590, 769. 68

On June 30, 1960, at the close of business, American had assets in excess of $264 million, liabilities of more than $243 million, and capital accounts of more than $21 million.

Several of the directors of American became members of the board of directors of Insurance.

The following adjustments were made upon American's books as a result of the transfer of the insurance department to Insurance, the receipt of the 420,00 shares of Insurance stock, and the distribution of these 420,000 shares to American shareholders:

### A.

Debit:

Furniture and fixtures_____ $3, 090. 92
    To record on books June 30, 1960, unrecovered cost of furniture and fixtures of insurance department purchased in prior years and charged to expense.

Credit:

Undivided profits_____ 3, 090. 92
    June 30, 1960, unrecovered cost of furniture and fixtures of insurance department purchased in prior years and charged to expense, restored to books.

### B.

Debit:

Securities—investment account_____ 6, 467. 25
    420,000 shares of American Commercial Agency, Inc., stock received in exchange for furniture and fixtures of insurance department.
        On book items (unrecovered June 30, 1960, cost) _____ 3, 376. 33
        Off book items (unrecovered June 30, 1960, cost) _____ 3, 090. 92

Credit:

Furniture and fixtures_____ 6, 467. 25
    June 30, 1960, unrecovered cost furniture and fixtures of insurance department exchanged for 420,000 American Commercial Agency, Inc., stock.

### C.

Debit:

Undivided profits_____ 6, 467. 25
    420,000 shares American Commercial Agency, Inc., stock distributed to shareholders of American Commercial Bank.

Credit:

Securities—investment account_____ 6, 467. 25
    420,000 shares American Commercial Agency, Inc., stock distributed to stockholders of American Commercial Bank.

After these adjustments had been made, the adjusted undivided profits of American had been reduced by $3,376.33 to $2,587,393.35.

After the consolidation, NCNB had surplus and undivided profits in excess of $25 million.

Immediately after the distribution of the Insurance shares and the exchange of their American shares for the shares of stock in the NCNB, the 1,571 shareholders of American owned 100 percent of the stock of Insurance and 54.385 percent of the stock of NCNB.

The divestment of the insurance department was necessary because of the legal requirement that a national bank, which the consolidated bank was to be, would not be permitted to engage in the insurance business in a city the size of Charlotte.

American distributed a cash dividend of 60½ cents per share payable June 30, 1960, to shareholders of record on June 21, 1960.

American filed a final income tax return for the period January 1 to June 30, 1960. NCNB filed an initial income tax return for the period July 1 to December 31, 1960. In August 1960 an authenticated copy of the agreement of consolidation of American and Security was filed with the Secretary of State for the State of North Carolina.

On June 30, 1960, the petitioner owned 2,268 shares of the capital stock of American. It received, in 1960, 2,268 shares of the capital stock of Insurance. In its 1960 return the petitioner reported cash dividends of $2,506.14 from American and reported receipt of the shares of Insurance as received in a nontaxable transaction.

### OPINION

The petitioner trust, which was a stockholder in American, a State bank, received a distribution of stock in Insurance in a "spin-off" from American of its insurance department in connection with the consolidation of the State bank with Security, a national bank. The dispute is whether the distribution is taxable as a dividend.

The problem arises out of a double reorganization. The consolidation of the two banks is concededly a reorganization within the meaning of section 368(a)(1)(A) of the Internal Revenue Code of 1954, in which the stock in the consolidated bank received by the shareholders in exchange for their stock in the participating banks is received without recognition of gain or loss. The transfer by American of its insurance department is within the definition of a reorganization in section 368(a)(1)(D)[1] if the stock of Insurance was distributed

---

[1] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

  (a) REORGANIZATION.—

    (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

      (A) a statutory merger or consolidation;

      \*     \*     \*     \*     \*     \*     \*

      (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

      \*     \*     \*     \*     \*     \*     \*

  (b) PARTY TO A REORGANIZATION.—For purposes of this part, the term "a party to a reorganization" includes—

in a transaction which qualifies under section 355.[2]    The respondent contends that the requirements of that section are not met.

In Rev. Rul. 56–557, 1956–2 C.B. 199, the respondent ruled that when a bank which had conducted a real estate business in addition to banking transferred the real estate business to a new corporation in exchange for its stock and distributed that stock to the bank's share-

(1) a corporation resulting from a reorganization, and

(2) both corporations, in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

\* \* \* \* \* \* \*

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

[2] SEC. 355.  DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, \* \* \*

\* \* \* \* \* \* \*

solely stock \* \* \* of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock \* \* \* in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock \* \* \* in the controlled corporation held by it immediately before the distribution, \* \* \*

\* \* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) NON PRO RATA DISTRIBUTIONS, ETC.—Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

\* \* \* \* \* \* \*

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a)(1)(D)).

\* \* \* \* \* \* \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation \* \* \* is engaged immediately after the distribution in the active conduct of a trade or business, \* \* \*

\* \* \* \* \* \* \*

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, \* \* \*

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired \* \* \* by another corporation within the period described in subparagraph (B), \* \* \*

holders, the transaction comes within the purview of sections 355, 361, and 368(a) (1) (D) of the Code, and no gain or loss is to be recognized to the shareholders. There can be no doubt that had the insurance business of American been transferred prior to the negotiation of the agreement for consolidation of American and Security, the transaction would be a nontaxable spin-off within the interpretation of the above ruling. However, since the transfer was agreed upon in connection with the consolidation, the spin-off may not be treated as an isolated transaction. All parts of the transaction must be considered. *Helvering* v. *Limestone Co.*, 315 U.S. 179 (1942). The divestment was called for in the consolidation agreement, and the two transactions are related.

The spin-off was basically a nontaxable transaction as to the 1,571 shareholders of American, in accordance with the above ruling. Prior to it, their shares represented interests in the banking business, including the insurance business. After the distribution their American shares represented interests in the banking business and their Insurance shares represented interests in the insurance business. They had two shares of stock for each share held before but owned no greater economic interest than before. The bank had less in assets, but the total interest of any shareholder was not increased or diminished. The same assets were held by the two corporations instead of by one. There was no economic change. There would appear to be no reason why the fact that the consolidation of the two banks occurred at the same time or immedediately after the spin-off should require a different interpretation of the transfer to Insurance. This was just such a readjustment of corporate structures as was required by business exigencies and which effected only a rearrangement of continuing interests in property under modified corporate forms on the part of those persons who were the owners of the enterprise prior to the distribution. See sec. 1.355–2(c), Income Tax Regs.

The respondent argues that there was no valid business purpose for the divestment by American of its insurance brokerage business, and that although the statute prohibiting a national bank from operating such a business was the principal reason for the spin-off, this action was not forced upon American but became required only when the bank voluntarily agreed to consolidate under the national bank's charter.

We do not agree. American was the result of a merger in 1957 between a State bank and a national bank in which the business was continued under a State bank charter. When the 1960 consolidation was discussed, the representatives of the banks made the choice to consolidate under the national bank's charter. This was a business decision reached after negotiations. This decision was approved by the shareholders at meetings called for the purpose. It made necessary the divestment within a reasonable time of the insurance business.

Complying with the law is assuredly a valid business purpose. There was another business reason, though not so compelling a factor, in that when the continuing bank opened branches in other cities, as was contemplated, it was deemed desirable to avoid competing with established insurance agencies in those cities which might otherwise become customers of the bank.

The respondent next contends that there was no corporate or shareholder business purpose for selecting the spin-off alternative as the method for the divestment of the insurance department; that the consolidation agreement did not require this method, but authorized "such other method for the benefit of the shareholders of American as shall be approved by its Board of Directors"; that no valid corporate business purpose is shown; and that no shareholder business purpose is shown, aside from tax considerations. The respondent suggests that a sale of the business or a sale of the stock of Insurance, followed by a distribution of cash to the shareholders, would be alternatives more beneficial to American, since by the spin-off the bank received nothing for assets stipulated to be worth more than half a million dollars.

The supposition that American received nothing is erroneous. It received 420,000 shares of stock stipulated to be worth $1.25 per share. It was permitted under the statute to distribute this stock to its shareholders. Sec. 355(a)(1)(A). The parties have the right so to arrange their business transactions as to minimize the incidence of tax by whatever means the law permits. *United States* v. *Isham*, 84 U.S. 496; *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950). They are not required to select a method more favorable to the respondent. The method of divestment selected was a business decision made for corporate and shareholder purposes. It did not result in tax avoidance but permitted tax postponement in a manner authorized by the statute.

The respondent also contends that the tailoring of a corporation's assets solely for the purpose of an agreed-upon consolidation is not, of itself, a valid business purpose for divestment, citing *Helvering* v. *Elkhorn Coal Co.*, 95 F. 2d 732 (C.A. 4, 1937), certiorari denied 305 U.S. 605, rehearing denied 305 U.S. 670, and *Richard K. Mellon*, 12 T.C. 90 (1949), aff'd. 184 F. 2d 157 (C.A. 3, 1950).

The *Elkhorn Coal Co.* case involved a deficiency determined against the Elkhorn Coal & Coke Co. for the year 1925, which respondent sought to recover from the petitioners as transferees. The principal question involved was whether the transfer by Elkhorn Coal & Coke Co. of certain mining properties to the Mill Creek Coal & Coke Co. constituted a reorganization within the provisions of section 203(h) (1)(A) of the Revenue Act of 1926, so as to render the gain thereon nonrecognizable, as claimed by the petitioners, or was a taxable transaction as claimed by respondent. In that case Elkhorn Coal & Coke

Co. (A), in furtherance of a plan to transfer certain of its assets to Mill Creek Coal & Coke Co. (C), a corporation not owned or controlled by A or its stockholders, transferred such of its assets as were not wanted by C to Elkhorn Coal Co. (B), a new corporation organized by A for that purpose, for stock of B, which stock A then distributed to its stockholders pro rata. The remaining or "wanted" assets were then transferred by A to C in exchange for stock of the latter. Thereafter, B issued the remainder of its authorized shares to A in exchange for all of the stock of A and, on the same day, B caused A to transfer to it the stock of C which it had received in the exchange mentioned above for the "wanted" assets, and proceeded to dissolve A. The purpose of the transfer of the "unwanted" assets to B was in order that the transfer of the "wanted" assets to C might consist of "substantially all the assets" of the transferor and thereby constitute a reorganization within the provisions of section 203(h)(1)(A) of the Revenue Act of 1926.

The Fourth Circuit, reversing the decision of the Board of Tax Appeals (34 B.T.A. 845), stated, among other things:

No business whatever was done by the old company after the transfer of assets to the Mill Creek Company on December 31st; and no reason appears for the organization of the new company except to provide a transferee to take over and hold the assets which were not to be transferred to the Mill Creek Company so that the transfer to that company when made would be a transfer of all the assets of the old company.

\* \* \* \* \* \* \*

The creation of the new company and its acquisition of the assets of the old was not a corporate reorganization, therefore, within the meaning of the statute or within any fair meaning of the term "reorganization." It did not involve any real transfer of assets by the business enterprise or any rearranging of corporate structure, but at most a mere shifting of charters, having no apparent purpose except the avoidance of taxes on the transfer to the Mill Creek Company which was in contemplation.

On rehearing, it further said:

It was not intended by what was said in the original opinion, to the effect that the transfer of assets from the old company to the new did not constitute a bona fide reorganization, to suggest that the transfer was a taxable transaction, but to point out that the creation of the new company and the transfer of the assets to it was a mere shifting of charters having no purpose other than to give to the later transfer to Mill Creek the appearance of a transfer of all the corporate assets so as to bring that transfer within the non-recognition provisions of section 203(h)(1)(A), Revenue Act 1926, 44 Stat. 12. The transfer to the new company was non-taxable whether it was a real reorganization or a mere shifting of charters, which would of course come within the terms of the reorganization statute. It is only in relation to the subsequent transfer to Mill Creek that it becomes important to determine whether the organization of the new company and its taking over of the assets was a genuine reorganization. If there was no real reorganization and transfer, but a mere shifting of charters, the subsequent transfer to Mill Creek was not within the terms of the nonrecognition provision of the statute.

In the present case we are not concerned with the taxability of the transfer from American to NCNB. The merger or consolidation of American with Security has been conceded to be a valid nontaxable reorganization within the provisions of section 368(a)(1)(A) of the Internal Revenue Code of 1954. In the present case there was a valid corporate purpose for the transfer from American to Insurance, the method chosen was for valid corporate and shareholder reasons, and there was no tax-avoidance motive. Consequently, the transfer from American to Insurance qualifies as a valid nontaxable reorganization under section 355. The opinion of the Fourth Circuit in the *Elkhorn Coal Co.* case, particularly on rehearing, supports our conclusion.

The facts in the *Richard K. Mellon* case are closely analogous to those in the *Elkhorn Coal Co.* case and need not be further discussed. In the *Mellon* case we followed the reversal by the Court of Appeals for the Fourth Circuit in the *Elkhorn Coal Co.* case.

The respondent contends that the spin-off was a transaction used principally as a device for the distribution of earnings and profits of American within the meaning of section 355(a)(1)(B). Subparagraph (B) provides, in part, that the mere fact that subsequent to the distribution stock in one of the corporations is sold or exchanged by all or some of the distributees shall not be construed to mean that the transaction was so used, unless it was sold or exchanged pursuant to an arrangement previously negotiated or agreed upon. The respondent says that since the shareholders of American, after receiving the stock of Insurance, exchanged their stock in American for stock in NCNB pursuant to the previously negotiated consolidation agreement, the facts should be construed as meaning that the transaction was used principally as a device for distributing profits of American. The statute is to the effect that a prearranged exchange may be construed as showing that the distribution was used principally as a device for the distribution of earnings of the distributing corporation, but we do not interpret it as requiring that conclusion. See sec. 1.355–2(b), Income Tax Regs. Since the other facts all point to the contrary, we find that the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation and that section 355(a)(1)(B) does not disqualify the transaction here.

The respondent contends that for the transaction to qualify as tax free under section 355, the shareholders of the distributing corporation must be in control of both the distributing corporation and the controlled corporation after the spin-off. He construes this to mean that here the shareholders of American would have to be in control of both Insurance and NCNB, the surviving organization in the consolidation of American and Security. The control referred to is the control of 80 percent or more of the stock as required by section

368(c). Respondent says such control has not been shown, since, while the shareholders of American held 100 percent of the stock of Insurance immediately after the spin-off and consolidation, the same shareholders held only 54.385 percent of the stock of NCNB. The short answer to this is that the spin-off was from American and not NCNB. NCNB had no interest in Insurance before or after the spin-off or consolidation and made no distribution of the stock in question. Concededly the shareholders of American were in control of the distributing corporation (American) and the controlled corporation (Insurance) after the spin-off. We know of no provision of the statute or related regulations which would require that the shareholders of American should control 80 percent or more of the stock of NCNB into which American was merged or consolidated after the spin-off.

Section 355(b) provides that subsection (a) shall apply only if the distributing corporation and the controlled corporation are engaged immediately after the distribution in the active conduct of a trade or business. This is commonly referred to as the continuity of business interest concept. It is conceded that Insurance was so engaged after June 30, 1960. The respondent contends, however, that American was not so engaged after that date, since it then ceased to operate under its own charter and was not thereafter in existence. Notice was given to the secretary of state for the State of North Carolina of the consolidation. The respondent refers to the State law, N.C. Gen. Stat. sec. 55-110, which provides, in part, that when a consolidation of North Carolina corporations has been effected, the separate existence of all corporations parties to the consolidation, except the surviving or new corporation, shall cease.

The consolidation here in question was of a State bank and a national bank under the provisions of the National Banking Act and is therefore controlled by the Federal law.

Section 215(e) of title 12 of the United States Code (formerly classified as section 34a) provides as follows:

(e) *The corporate existence of each of the consolidating banks* or banking associations participating in such consolidation *shall be merged into and continued in the consolidated national banking association and such consolidated national banking association shall be deemed to be the same corporation as each bank or banking association participating in the consolidation.* All rights, franchises, and interests of the individual consolidating banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the consolidated national banking association by virtue of such consolidation without any deed or other transfer. The consolidated national banking association, upon the consolidation and without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests, including appointments, designations, and nominations, and all other rights and interests

as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, and committee of estates of lunatics, and in every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the consolidating banks or banking associations at the time of consolidation, * * * [Emphasis supplied.]

The respondent contends that this provision by which consolidating banks are *deemed* to continue and be the same corporations as before is not determinative of the income tax consequences under the Internal Revenue Code; that although for National Banking Act purposes there was a constructive continuance of American there was not a factual one; and that the tax law must be applied to facts, not fictions.

So far as we are aware the applicability of section 215(e) of title 12, U.S.C., to section 355(b) of the Internal Revenue Code of 1954 has not heretofore been considered by this or any other court. It has been considered in its relation to other provisions of the internal revenue laws involving issues with which we are not here concerned.[3] We think it is clearly applicable here, that Congress meant what is there said, and that in contemplation of law, if not in fact, the corporate existence of each of the consolidating banks (American and Security) was merged into and continued in the consolidated national bank (NCNB). Accordingly, we hold that the distributing corporation, American, was engaged immediately after the distribution in the active conduct of a business within the meaning of section 355(b).

The respondent cites *Curtis* v. *United States*, 215 F. Supp. 885 (N.D. Ohio 1963), on appeal (C.A. 6), in which the court held that the spin-off of a warehouse, operated as a separate business activity, preliminary to a merger of two corporations engaged in the business of serving the educational, school, and stationery fields was part of the plan of merger and that the requirement of section 355, that the distributing corporation must itself engage in the active conduct of a trade or business after the spin-off, was not satisfied when that corporation merged with another. The decision in the *Curtis* case is not applicable here in view of our finding that the distributing bank is continuing in business.

We find that the requirements of section 355 have been met. The distribution by American was solely of stock of a corporation controlled by American before the distribution; all the stock was distributed; the controlled corporation and the distributing corporation were each engaged immediately after the distribution in the active

---

[3] See *Old Nat. Bank in Evansville* v. *Commissioner*, 256 F. 2d 639 (C.A. 7, 1958), reversing in part 28 T.C. 1075 (1957) ; *Fidelity-Baltimore National Bank* v. *United States*, 328 F. 2d 953 (C.A. 4, 1964), reversing 213 F. Supp. 631 (D. Md. 1963). See also *United States* v. *Seattle Bank*, 321 U.S. 583 ; *United States* v. *Northwestern Nat. Bank & T. Co. of Minneapolis*, 137 F. 2d 761 (C.A. 8, 1943).

conduct of a business previously carried on for at least 5 years; and the transaction was not used principally as a device for the distribution of earnings of American. Accordingly, no gain or loss is to be recognized to the shareholders, including the petitioner.

*Decision will be entered for the petitioner.*